James E. ELBAOR, M.D., Petitioner,

v.

Carole Mercer SMITH, Respondent.

No. D–1163.

Supreme Court of Texas.

Dec. 2, 1992.

Rehearing Overruled Jan. 20, 1993.

John Hill Cayce, Jr., E. Earl Harcrow, and D. Robert Jones, Fort Worth, for petitioner.

George C. Dixie, Aglaia D. Mauzy, Calvin B. Almquist, David E. Keltner, Dallas, Craig M. Price, and Karen S. Precella, Fort Worth, for respondent.

## OPINION

GONZALEZ, Justice.

In this medical malpractice case we consider: 1) whether the trial court should have submitted to the jury a requested issue concerning the plaintiff's contributory negligence; and 2) whether Mary Carter agreements are void as contrary to public policy. The trial court rendered judgment in favor of the plaintiff, and the court of appeals affirmed. 845 S.W.2d 282. We hold that the trial court committed reversible error in refusing to submit an issue on the plaintiff's contributory negligence. We further hold that Mary Carter agreements are void as against public policy.[1] We thus reverse the judgment of the court of appeals and remand this cause to the trial court for a new trial.

### I.

At 2:00 a.m. on May 8, 1985, Carole Smith was seriously injured in a single-vehicle accident when the Corvette she was driving left the highway and collided with a tree. She received emergency treatment at the Dallas/Fort Worth Medical Center–Grand Prairie ("D/FW Medical Center")

---

1. See section III A of this opinion, infra.

from Dr. Abraham Syrquin for multiple injuries including a compound fracture of her left ankle. In an effort to stop the bleeding, Dr. Syrquin performed emergency surgery closing the ankle wound. Ms. Smith remained under Dr. Syrquin's treatment for eight days at D/FW Medical Center after which time she was transferred to the care of Dr. James Elbaor, an orthopedic surgeon, at Arlington Community Hospital ("ACH").

While Ms. Smith was at ACH, she was treated by a team of physicians including Dr. Elbaor, Dr. Joseph Stephens, a plastic surgeon, and Dr. Bienvenido Gatmaitan, an infectious disease specialist. Upon admission to ACH, Ms. Smith was evaluated by Dr. Gatmaitan and placed on intravenous antibiotics. During the course of her stay, Dr. Stephens performed two debridements of the ankle wound.[2] Although the issue of whether Ms. Smith's ankle was infected was hotly contested at trial, Dr. Stephens' progress notes following both debridement procedures indicated that there was no active infection present in the ankle. On June 3, Ms. Smith was transferred to the care of Dr. Wayne Burkhead at Baylor University Medical Center ("Baylor"). Four days after admission, Dr. Burkhead removed a two inch section of bone from Ms. Smith's ankle. Ms. Smith received treatment from several orthopedic specialists over the next three years which ultimately led to the fusion of her ankle joint.

Ms. Smith's medical records from D/FW Medical Center and ACH indicate that she refused to cooperate with the instructions of her doctors and nurses. She frequently refused to take her antibiotics, and directed family members to remove weights from her femoral traction device. Some time later, Ms. Smith was transferred to another hospital for surgery to shorten and fuse the bone, leaving her permanently disabled.

Ms. Smith filed suit against D/FW Medical Center, ACH, Drs. Syrquin, Elbaor, Stephens, and Gatmaitan. Sometime before trial, Ms. Smith entered into Mary Carter agreements with Dr. Syrquin, Dr. Stephens, and ACH.[3] The Mary Carter agreements provided for payments to Ms. Smith of $350,000 from Dr. Syrquin, $75,000 from ACH, and $10 from Dr. Stephens. Under the terms of each agreement, the settling defendants were required to participate in the trial of the case. The agreements also contained pay-back provisions whereby Dr. Syrquin and ACH would be reimbursed all or part of the settlement money paid to Ms. Smith out of the recovery against Dr. Elbaor.

Ms. Smith nonsuited her claim against Dr. Gatmaitan and settled and dismissed her claim against D/FW Medical Center. Dr. Elbaor filed a cross claim against Dr. Stephens, Dr. Gatmaitan,[4] Dr. Syrquin, and ACH. He alleged that in the event he was found liable to Ms. Smith, that he was entitled to contribution from these defendants. Furthermore, Dr. Elbaor requested that the trial court hold the Mary Carter agreements void as against public policy, and alternatively, to dismiss the settling defendants from the suit. The trial court denied this request. The suit proceeded to trial against Dr. Elbaor and the cross defendants.

At trial, the jury found that Ms. Smith's damages totalled $2,253,237.07, of which Dr. Elbaor was responsible for eighty-eight percent, and Dr. Syrquin for twelve percent. After deducting all credits for Dr. Syrquin's percentage of causation and settlements with other defendants, the trial

---

**2.** "Debridement" is the removal of foreign material and contaminated or devitalized tissue from or adjacent to a traumatic or infected lesion until surrounding healthy tissue is exposed. DORLAND'S POCKET MEDICAL DICTIONARY 187 (23rd ed. 1982).

**3.** These agreements acquired their name from a case out of Florida styled *Booth v. Mary Carter Paint Co.,* 202 So.2d 8, 10–11 (Fla.App.1967). When the Florida Supreme Court finally ad-

dressed Mary Carter agreements, it noted their potential to skew the trial process and thus established supervisory guidelines to limit their ill effects. *See Ward v. Ochoa,* 284 So.2d 385 (Fla.1973).

**4.** Dr. Gatmaitan was later dismissed from the lawsuit after Dr. Elbaor nonsuited his claim against him.

court rendered judgment against Dr. Elbaor for $1,872,848.62.

## II.

◼ We first consider Dr. Elbaor's assertion that the trial court erred by refusing to submit to the jury a question on Ms. Smith's contributory negligence (along with questions addressing his own negligence and that of Drs. Syrquin and Stephens). The court of appeals held that the trial court's refusal was not error because there was no evidence of Ms. Smith's contributory negligence. 845 S.W.2d at 284. The court concluded that evidence of Ms. Smith's refusal of antibiotics only entitled Dr. Elbaor to an instruction on Ms. Smith's failure to mitigate damages.

Rule 278 of the Texas Rules of Civil Procedure provides that:

[t]he court shall submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and evidence.

This rule provides a substantive, non-discretionary directive to trial courts requiring them to submit requested questions to the jury if the pleadings and any evidence support them. To determine whether legally sufficient evidence supported Dr. Elbaor's contributory negligence submission, we must examine the record for evidence supporting Dr. Elbaor's question and ignore all evidence to the contrary. *See, e.g.,* *Roy v. Howard–Glendale Funeral Home*, 820 S.W.2d 844, 846 (Tex.App.—Houston [1st Dist.] 1991, writ denied) ("trial court is obligated to submit the question if the evidence [supporting question] amounts to more than a scintilla"); *Times Herald Printing v. A.H. Belo Corp.*, 820 S.W.2d 206, 215 (Tex.App.—Houston [14th Dist.] 1991, no writ) (in reviewing evidence regarding refused question, appellate court "consider[ed] evidence most favorably in behalf of the complaining party"); *Kerrville HRH, Inc. v. City of Kerrville*, 803 S.W.2d 377, 383 (Tex.App.—San Antonio 1990, writ denied) (trial court "may refuse to submit a question only if no evidence exists to warrant its submission"); *Bryan v. Dockery*, 788 S.W.2d 447, 451 (Tex. App.—Houston [1st Dist.] 1990, no writ) ("evidence must be considered in favor of the party against whom the questions were refused and if it supports the question then it must be submitted"); *Phillips Pipeline Co. v. Richardson*, 680 S.W.2d 43, 48 (Tex. App.—El Paso 1984, no writ) ("evidence must be considered most favorably in behalf of the party against whom the issues were refused, and if there is any conflicting probative evidence in the record, those questions are for the jury's determination"). A trial court may refuse to submit an issue only if no evidence exists to warrant its submission. *Brown v. Goldstein*, 685 S.W.2d 640, 641 (Tex.1985) (where evidence was conflicting, it is error to refuse submission of contributory negligence issues); *Garza v. Alviar*, 395 S.W.2d 821, 824 (Tex.1965) (contention that question should not have gone to jury only sustainable if no evidence supports question).

In order to determine whether Dr. Elbaor's questions should have been presented to the jury, we must examine the record to see if there is some evidence that Ms. Smith's refusal to take antibiotics arguably preceded the onset of infection in her ankle. If we find some evidence indicating that Ms. Smith may have been contributorily negligent, then we must conclude that the trial court should have submitted Dr. Elbaor's requested contributory negligence question; and accordingly, we must reverse this cause and remand it for a new trial.

A brief chronology of events will aid our analysis. After the accident on May 8, 1985, Ms. Smith was treated by Dr. Syrquin at D/FW Medical Center for injuries to her left shoulder, femur, and ankle. On May 17, she was transferred to ACH and into the care of Drs. Elbaor, Stephens, and Gatmaitan. She remained under their care until she was transferred to Baylor on June 3.

Shortly after Ms. Smith arrived at ACH, Dr. Gatmaitan rendered an initial diagnosis concluding that her ankle was infected, and

he began treating her with intravenous antibiotics.[5] Ms. Smith, however, did not exhibit symptoms typical of systemic infection. That is, as Dr. Stephens' medical notes reveal, she had no fever and her ankle wound was dry and appeared to be healing. Dr. Elbaor's notes of May 20 show that he decided to have Ms. Smith's ankle debrided the following day in order to discover whether it was infected. He also noted that there was no drainage from the ankle as would be typical of an infected wound. Dr. Stephens performed the first of two debridements on Ms. Smith's ankle on May 21. His subsequent medical notes reveal that the wound was clean, healthy, and dry. And on May 26, he noted, regarding the ankle wound, that "I do not feel it is infected." Dr. Stephens still thought the ankle healthy on May 30, just a few days before Ms. Smith transferred herself to Baylor; and he was contemplating performing a skin graft, which, as Dr. Elbaor testified, would have been unthinkable if there had been any sign of infection. The record contains evidence of Ms. Smith's refusal of the antibiotics that were essential to prevent infection in her ankle.[6] Ms. Smith began refusing antibiotics shortly after her admission to ACH.[7] The administering nurse noted that Ms. Smith refused medication on May 20. And Dr. Elbaor's assistant's notes indicate that Ms. Smith was still refusing them on May 29, shortly before her transfer to Baylor. Dr. Joseph H. Gaines, a medical expert, testified that Ms. Smith had refused antibiotics at least six times while she was at ACH. As Dr. Elbaor testified, "you have to keep [antibi-

otics] at a certain level in the bloodstream and tissues to attack or cure any organisms that may be there." He further noted that the failure to take antibiotics "can allow resistant organisms to grow."

The foregoing discussion reveals that the record contained some evidence that Ms. Smith's ankle was not infected when she arrived at ACH on May 17, 1985. Further, the record indisputably indicates that Ms. Smith refused antibiotics, essential to the maintenance of her ankle's health, throughout her stay at ACH. Taken together, this evidence amounts at least to some evidence supporting Dr. Elbaor's assertion of Ms. Smith's contributory negligence. Accordingly, the trial court should have submitted it to the jury. *See Southwestern Bell Tel. Co. v. Thomas*, 554 S.W.2d 672, 674 (Tex. 1977) (trial court must submit issues if there is "some evidence" of contributory negligence).

■ Dr. Elbaor properly preserved error regarding the trial court's wrongful refusal of the contributory negligence questions, instructions, and definitions. He complained during the charge conference that the court's submission failed to adequately account for Ms. Smith's contributory negligence. He also submitted contributory negligence and proximate cause questions in "substantially correct wording" as required by Rule 278. *See Placencio v. Allied Indus. Int'l Exch.*, 724 S.W.2d 20, 21 (Tex.1987).

■ The court of appeals held that the evidence raised issues of failure to miti-

---

5. Dr. Robert Sorokolit, a medical expert, testified that Dr. Gatmaitan erred in his diagnosis of Ms. Smith's ankle because: (1) Ms. Smith had no fever; (2) Dr. Gatmaitan's notes said "nothing about drainage, nothing about erythema (sic), [and] nothing about odor;" and (3) the May 18 culture taken from ankle showed no bacterial growth. Based on these factors, Dr. Sorokolit concluded that Ms. Smith's ankle must not have been infected.

6. Regarding the consequences of a patient's refusing antibiotics, Dr. Gaines, an orthopedic surgeon and recognized expert, testified that:

Bacteria is capable of reproducing itself in anywhere from 20 minutes to an hour and a half. Antibiotics last much longer than that in the system, and one uses the continuous influx of antibiotics to knock down the numbers of bacteria. If you skip your dose, then those bacteria reduplicate very quickly and outrun the simple proportionate amount of time that you lag on your drug treatment. So skips in dosages are very, very important.

7. The record also contains evidence that Ms. Smith refused antibiotics while at D/FW Medical Center, even before she was transferred to ACH.

gate, but not contributory negligence. As we have observed, "[n]egligence that merely increases or adds to the extent of the loss or injury occasioned by another's negligence is not ... contributory negligence." *Kerby v. Abilene Christian College*, 503 S.W.2d 526, 528 (Tex.1973). In *Kerby*, the plaintiff was driving a delivery truck with its sliding door open. He collided with a bus, the force of which threw him from the truck, causing him serious injuries. The trial court submitted a question on the driver's contributory negligence. *Id.* at 527. This Court held that the trial court should have accounted for any increase in injury caused by the plaintiff driving with the door open through a mitigation of damages question, and not one of contributory negligence. For this reason, the dissent's reliance on *Kerby* is misplaced.

Moreover, the instant case is fundamentally distinguishable from *Kerby*. Driving a delivery truck with its sliding door open is neither an intrinsically harmful act, nor is it a breach of a legal duty. However, the unusual act of refusing to take antibiotics, which a medical doctor has prescribed to preserve a patient's health, plainly may cause harm. Additionally, it breaches a duty of cooperation which patients owe treating physicians who assume the duty to care for them. Ms. Smith was arguably free of infection when she arrived at ACH. She began breaching her duty to cooperate from the moment she arrived by refusing antibiotics, and she remained uncooperative throughout her stay at ACH. Ms. Smith's refusal to take the antibiotics also constituted an inherently harmful act, because, as the testimony at trial demonstrated, refusing antibiotics can permit an infection to develop. Thus, her refusal of medication essential to maintaining her health created a fact issue as to whether she contributed to the infection that eventually afflicted her ankle.

Furthermore, the Court in *Kerby* held that the plaintiff's conduct of driving with the door open was not contributory negligence because it did not contribute to the accident; rather, it only increased the injuries suffered in the accident. In the present case, the "accident" equates to the medical problem complained of: Ms. Smith's infected ankle. Her conduct arguably did contribute to the infection. In *Kerby*, there would have been a wreck, and a lawsuit, even if the plaintiff had kept the door of his truck closed. Here, there might have been no infection, and thus no claim of medical malpractice, had Ms. Smith followed her doctors' instructions.

The trial court improperly addressed Ms. Smith's conduct through a mitigation of damages instruction. The plain language of Rule 278 bound the trial court to submit Dr. Elbaor's question. Dr. Elbaor pleaded that Ms. Smith committed contributory negligence by refusing to take antibiotics while under his care at ACH, and he put on evidence at trial supporting his assertion that Ms. Smith's refusal to take antibiotics contributed to her injury. Therefore, the trial court in this case failed to follow the directive of Rule 278. Instead, the trial court chose to account for Ms. Smith's negligence by submitting an instruction on mitigation of damages which instructed the jury to exclude from its verdict any damages attributable to Ms. Smith's negligence. This instruction contained no definition of negligence upon which the jury could have based its decision as to whether she was negligent. *See Griffin v. Eakin*, 656 S.W.2d 187, 190 (Tex.App.—Austin 1983, writ ref'd n.r.e.) (absence of negligence definition confuses jury burdened with resolving negligence question).[8]

### III.

As previously noted, Ms. Smith entered into Mary Carter agreements with Dr. Syr-

---

**8.** The trial court's submission on mitigation of damages read:

> Do not include any amount for any condition resulting from the failure, if any, of Carole Mercer Smith to have acted as a person of

ordinary prudence would have under the same or similar circumstances in caring for herself and cooperating in the treatment of her injuries, if any that resulted from the medical care made the basis of the lawsuit.

quin,[9] ACH,[10] and Dr. Stephens.[11] Under the terms of the agreements, the settling defendants were required to participate in the trial of the case. The agreements also contained pay-back provisions whereby Dr. Syrquin and ACH would be reimbursed for all or part of the settlement money paid to Ms. Smith out of the recovery against Dr. Elbaor.

Dr. Syrquin had performed emergency surgery on Ms. Smith's ankle. Testimony at trial revealed that Dr. Syrquin, who was not an orthopedic specialist, committed malpractice by closing the ankle too soon after debriding it. Eight days after the surgery, Dr. Syrquin recommended transferring Ms. Smith to ACH where she came under the care of, among others, Dr. Elbaor, an orthopedic specialist. At ACH, Dr. Elbaor observed but did not participate in two additional debridements of Ms. Smith's ankle which were performed by Dr. Stephens, a plastic surgeon. Dr. Stephens sought to explore and alleviate any infection in Ms. Smith's ankle. Additional expert medical testimony elicited during the trial demonstrated that, in all probability, Ms. Smith's ankle was beyond restoration by the time she arrived at ACH. Arguably neither the subsequent surgeries performed at ACH nor the care she received there could have remedied the damage caused by Dr. Syrquin's malpractice.

Although the Mary Carter agreements were not entered into evidence, the trial judge was troubled by them and he took remedial measures to mitigate their harm-ful effects by reapportioning the peremptory challenges, changing the order of proceedings to favor Dr. Elbaor, allowing counsel to explain the agreements to the jury, and instructing the jury regarding the agreements.[12]

During the trial, the settling defendants' attorneys, who sat at the table with Dr. Elbaor's attorneys, vigorously assisted Ms. Smith in pointing the finger of culpability at Dr. Elbaor. This created some odd conflicts of interest and some questionable representations of fact. For example, although Ms. Smith's own experts testified that Dr. Syrquin committed malpractice, her attorney stated during voir dire and in her opening statement that Dr. Syrquin's conduct was "heroic" and that Dr. Elbaor's negligence caused Ms. Smith's damages. And during her closing argument, Ms. Smith's attorney urged the jury to find that Dr. Syrquin had not caused Ms. Smith's damages. This is hardly the kind of statement expected from a plaintiff's lawyer regarding a named defendant. ACH and Drs. Syrquin and Stephens had remained defendants of record, but their attorneys asserted during voir dire that Ms. Smith's damages were "devastating," "astoundingly high," and "astronomical." Furthermore, on cross examination they elicited testimony from Ms. Smith favorable to her and requested recovery for pain and mental anguish. The settling defendants' attorneys also abandoned their pleadings on Ms. Smith's contributory negligence, argued that Ms. Smith should be awarded all of

9. This agreement called for Dr. Syrquin to pay Ms. Smith $350,000 contemporaneously with the signing of the agreement. Dr. Syrquin retained a financial stake in Ms. Smith's lawsuit, and was required to participate in the trial of the case. The agreement did not contain a severability clause.

10. This agreement called for ACH to pay Ms. Smith $75,000 contemporaneously with the signing of the agreement. ACH retained a financial stake in Ms. Smith's lawsuit against the other defendants, and ACH was required to participate in the trial of the case. The agreement also contained a severability clause which provided: "If any part of this Agreement is declared by a Court of competent jurisdiction to be invalid or unenforceable, such portion shall be deemed severed from this Agreement, and the remaining part shall remain in full force and effect as if the invalid or unenforceable provision had not been a part of this Agreement."

11. This agreement provided that Dr. Stephens pay Ms. Smith $10 contemporaneously with the signing of the agreement. It required Dr. Stephens' participation at trial, but it did not create a financial stake in the trial for Dr. Stephens.

12. In response to Dr. Elbaor's request to void the Mary Carter agreements, the trial judge evinced some doubt regarding their propriety:

Well, you know, if I were a justice on the Supreme Court and this was before me, I might rewrite—try to rewrite the law on [Mary Carter agreements]. . . .

her alleged damages, and urged that Dr. Elbaor was 100 percent liable.

## A.

■ The term "Mary Carter agreement" has been defined in different ways by various courts and commentators.[13] This Court has yet to definitively define the requisite elements of a Mary Carter agreement—our prior pronouncements utilized different definitions of the term. *Compare General Motors Corp. v. Simmons,* 558 S.W.2d 855 (Tex.1977) (a Mary Carter agreement is a settlement where the settling defendant remains a party at trial *and* retains a financial stake in the plaintiff's recovery), *overruled on other grounds by Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (Tex.1984) *with Bristol–Myers Co. v. Gonzales,* 561 S.W.2d 801, 805 (Tex.1978) (a Mary Carter agreement is a settlement where the settling defendant retains a financial interest in the plaintiff's recovery). Today we clarify what we mean by the term "Mary Carter agreement." A Mary Carter agreement exists when the settling defendant retains a financial stake in the plaintiff's recovery *and* remains a party at the trial of the case.[14] This definition comports with both the present majority view [15] and the original understanding of the term.[16]

■ A Mary Carter agreement exists, under our definition, when the plaintiff enters into a settlement agreement with one defendant and goes to trial against the remaining defendant(s). The settling defendant, who remains a party, guarantees the plaintiff a minimum payment, which may be offset in whole or in part by an excess judgment recovered at trial. *See General Motors Corp. v. Simmons,* 558 S.W.2d 855, 858 (Tex.1977), *overruled on other grounds by Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 427 (Tex.1984). This creates a tremendous incentive for the settling defendant to ensure that the plaintiff succeeds in obtaining a sizable recovery, and thus motivates the defendant to assist greatly in the plaintiff's presentation of the case (as occurred here). Indeed, Mary Carter agreements generally, but not always, contain a clause requiring the set-

13. The majority of cases and commentators define "Mary Carter agreement" as one in which the settling defendant possesses a financial stake in the outcome of the case and the settling defendant remains a party to the litigation. *See Ward v. Ochoa,* 284 So.2d 385, 387 (Fla.1973); *General Motors Corp. v. Lahocki,* 286 Md. 714, 410 A.2d 1039, 1042 (1980); *Johnson v. Moberg,* 334 N.W.2d 411, 415 (Minn.1983); *Bedford School Dist. v. Caron Constr. Co.,* 116 N.H. 800, 367 A.2d 1051, 1053 (1976); *Cox v. Kelsey–Hayes Co.,* 594 P.2d 354, 357 (Okla.1978); *General Motors Corp. v. Simmons,* 558 S.W.2d 855, 858 (Tex.1977); *Vermont Union School Dist. v. H.P. Cummings Constr. Co.,* 143 Vt. 416, 469 A.2d 742, 748 (1983); John E. Benedict, Note, *It's a Mistake to Tolerate the Mary Carter Agreement,* 87 Columbia L.Rev. 368, 369–70 (1987); David R. Miller, Comment, *Mary Carter Agreements: Unfair and Unnecessary,* 32 Sw.L.J. 779, 783–84 (1978). Many cases also describe other requisite elements of a Mary Carter agreement, such as secrecy. *See, e.g., Ward,* 284 So.2d at 387. Other cases and commentators argue that a Mary Carter agreement exists any time the settling defendant possesses a financial interest in the plaintiff's recovery. *See Bristol–Myers Co. v. Gonzales,* 561 S.W.2d 801, 805 (Tex.1978); Robin Renee Green, Comment, *Mary Carter Agreements: The Unsolved Evidentiary Problems in Texas,* 40 Baylor L.Rev. 449, 451 (1988).

14. A Mary Carter agreement does not have to expressly state that the settling defendant must participate in the trial. The participation requirement is satisfied by the mere presence of the settling defendant as a party in the case. Obviously, a Mary Carter agreement would not exist if a settling defendant acquires a financial interest in the outcome of the trial and then testifies at trial as a non-party witness. However, Rule 3.04(b) of the Texas Disciplinary Rules of Professional Conduct prohibits a lawyer from paying or offering to pay a witness contingent upon the content of the testimony of the witness or the outcome of the case. Certainly Rule 3.04(b) mandates that an attorney has an ethical duty to refrain from making a settlement contingent, in any way, on the testimony of a witness who was also a settling party.

15. *See supra* note 13.

16. The first case to utilize the term "Mary Carter agreement" was *Ward v. Ochoa,* 284 So.2d 385, 386 (Fla.1973). The Florida Supreme Court defined a Mary Carter agreement as "a contract by which one co-defendant secretly agrees with the plaintiff that, if such defendant will proceed to defend himself in court, his own maximum liability will be diminished proportionately by increasing the liability of the other co-defendants." *Id.* at 387.

tling defendant to participate in the trial on the plaintiff's behalf.

Given this Mary Carter scenario, it is difficult to surmise how these agreements promote settlement. Although the agreements do secure the partial settlement of a lawsuit, they nevertheless nearly always ensure a trial against the non-settling defendant. *Bedford School Dist. v. Caron Constr. Co.,* 116 N.H. 800, 367 A.2d 1051, 1054 (1976) (agreement required plaintiff to prosecute claim against remaining defendant and plaintiff could not settle the claim for under $20,000 without the consent of the settling defendant); *Lum v. Stinnett,* 87 Nev. 402, 488 P.2d 347, 348 (1971) (same). Mary Carter agreements frequently make litigation inevitable, because they grant the settling defendant veto power over any proposed settlement between the plaintiff and any remaining defendant. *See Bass v. Phoenix Seadrill/78 Ltd.,* 749 F.2d 1154, 1156 (5th Cir.1985) (Mary Carter agreement gave settling defendant veto power). Thus, "[o]nly a mechanical jurisprudence could characterize Mary Carter arrangements as promoting compromise and discouraging litigation—they plainly do just the opposite." *Stein v. American Residential Mgmt.,* 781 S.W.2d 385, 389 (Tex.App.—Houston [14th Dist.] 1989), *writ denied per curiam,* 793 S.W.2d 1 (Tex. 1990).

In his concurring opinion in *Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1, 8 (Tex. 1986) (on motion for rehearing), Justice Spears pointed out that "Mary Carter agreements should be prohibited because they are inimical to the adversary system,

and they do not promote settlement—their primary justification." The truth of this statement has been recognized by commentators and has been proven by the subsequent history regarding the use of Mary Carter agreements.[17]

The dissent approves of the supervisory guidelines suggested in the *Smithwick* concurrence, but his opinion misses the point. These guidelines were suggested as a stop-gap measure to ameliorate the harmful effects of Mary Carter agreements until this Court finally ruled on the agreements' propriety. Our inaction has created confusion, because the question as to whether Mary Carter agreements are valid has remained open. *See, e.g., Stein,* 781 S.W.2d at 388 ("Texas Supreme Court has not passed squarely on the question of [Mary Carter agreements'] validity"); *Adams v. Petrade Int'l, Inc.,* 754 S.W.2d 696, 718 (Tex.App.—Houston [1st Dist.] 1988, writ denied) ("the Texas Supreme Court has not held that such settlements are invalid"); *Lubbock Mfg. Co. v. Perez,* 591 S.W.2d 907, 920 (Tex.Civ.App.—Waco 1979, dism. agr.) (whether Mary Carter agreements are against public policy is "matter for determination by our Supreme Court of Texas").

### B.

Many jurisdictions have decided to tolerate the ill effects of Mary Carter agreements, presumably because they believe that the agreements promote settlement. Some have sought to mitigate the agreements' harmful skewing of the trial process by imposing prophylactic protections.[18]

17. Numerous commentators have criticized Mary Carter agreements. *See, e.g.,* June F. Entman, *Mary Carter Agreements: An Assessment of Attempted Solutions,* 38 U.Fla.L.Rev. 521 (1986); Robin Renee Green, Comment, *Mary Carter Agreements: The Unsolved Evidentiary Problems in Texas,* 40 Baylor L.Rev. 449 (1988); John E. Benedict, Note, *It's A Mistake to Tolerate the Mary Carter Agreement,* 87 Columbia L.Rev. 368 (1987); Richard Casner, Note, *Admission into Evidence of a Mary Carter Agreement from a Prior Trial is Harmful Error,* 18 Tex.Tech L.R. 997 (1987); David R. Miller, Comment, *Mary Carter Agreements: Unfair and Unnecessary,* 32 Sw.L.J. 779 (1978).

18. *See, e.g., Sequoia Mfg. Co. v. Halec Constr. Co.,* 117 Ariz. 11, 570 P.2d 782 (App.1977); *Shelton v. Firestone Tire & Rubber Co.,* 281 Ark. 100, 662 S.W.2d 473 (1983); *Ward v. Ochoa,* 284 So.2d 385 (Fla.1973); *Palmer v. Avco Distrib. Corp.,* 82 Ill.2d 211, 45 Ill.Dec. 377, 412 N.E.2d 959 (1980); *General Motors Corp. v. Lahocki,* 286 Md. 714, 410 A.2d 1039 (1980); *Johnson v. Moberg,* 334 N.W.2d 411 (Minn.1983); *Hegarty v. Campbell Soup Co.,* 214 Neb. 716, 335 N.W.2d 758 (1983); *Bedford School Dist. v. Caron Constr. Co.,* 116 N.H. 800, 367 A.2d 1051 (1976); *Corn Exch. Bank v. Tri–State Livestock Auction Co.,* 368 N.W.2d 596 (S.D.1985); *State ex rel. Vapor Corp. v. Narick,* 173 W.Va. 770, 320 S.E.2d 345 (1984).

Indeed, Texas previously has taken such an approach. *See Stein*, 781 S.W.2d at 389 (problematic incentives created by Mary Carter agreements require supervisory guidelines enabling trial judges to "keep a short leash on Mary Carter agreements' potential for wreaking havoc on the civil justice system"); *Smithwick*, 724 S.W.2d at 8–12 (Spears, J., concurring).[19] These protective measures generally seek to remove the secrecy within which Mary Carter agreements traditionally have been shrouded. *See Slusher v. Ospital*, 777 P.2d 437, 440 (Utah 1989) (secrecy is the essence of a Mary Carter agreement).

Justice Spears rightly noted in *Smithwick* the falsity of the premise upon which the prophylactic protection approach is founded, namely, the promotion of equitable settlements. *Id.* at 8. Mary Carter agreements instead:

> present to the jury a sham of adversity between the plaintiff and one co-defendant, while these parties are actually allied for the purpose of securing a substantial judgment for the plaintiff and, in some cases, exoneration for the settling defendant.

June F. Entman, *Mary Carter Agreements: An Assessment of Attempted Solutions*, 38 U.Fla.L.Rev. 521, 574 (1986); *see also General Motors Corp. v. Lahocki*, 286 Md. 714, 410 A.2d 1039, 1046 (1980). The agreements pressure the "settling" defendant to alter the character of the suit by contributing discovery material, peremptory challenges, trial tactics, supportive witness examination, and jury influence to the plaintiff's cause. *See* John E. Benedict, Note, *It's A Mistake to Tolerate the Mary Carter Agreement*, 87 Columbia L.Rev. 368, 372–73 (1987). These procedural advantages distort the case presented before a jury that came "to court expecting to see a contest between the plaintiff and the defendants [and] instead see[s] one of the defendants cooperating with the plaintiff." *Smithwick*, 724 S.W.2d at 9 (Spears, J., concurring).

Mary Carter agreements not only allow plaintiffs to buy support for their case,[20] they also motivate more culpable defendants to "make a 'good deal' [and thus] end up paying little or nothing in damages." *Id.; cf. Slayton v. Ford Motor Co.*, 140 Vt. 27, 435 A.2d 946, 947 (1981) (jury may infer that non-settling defendant was the most culpable defendant because plaintiff did not settle with that defendant). Remedial measures cannot overcome nor sufficiently alleviate the malignant effects that Mary Carter agreements inflict upon our adversarial system. No persuasive public policy justifies them, and they are not legitimized simply because this practice may continue in the absence of these agreements. The Mary Carter agreement is simply an unwise and champertous device that has failed to achieve its intended purpose. *See Lum*, 488 P.2d at 351 (Mary Carter agreements essentially champertous because settling defendant retains financial interest in plaintiff's success against non-settling defendant); *cf. Monjay v. Evergreen School Dist.*, 13 Wash.App. 654, 537 P.2d 825, 830 (1975).

### IV.

The case before us reveals yet another jury trial and verdict distorted by a Mary Carter agreement. The trial judge, who fully grasped the detrimental effect these agreements could have on the outcome, attempted to monitor the lawsuit by assiduously applying the guidelines suggested in the *Smithwick* concurrence. The conduct of this trial, however, confirms the apprehension expressed by Justice Spears in *Smithwick*: that these remedial measures would only mitigate and not eliminate the unjust influences exerted on a trial by

---

**19.** The guidelines provided in the *Smithwick* concurrence require that Mary Carter agreements: (1) are discoverable; (2) should be fully disclosed "to the trial court before trial or immediately after the agreement is formed;" (3) should be considered by the trial court in allowing jury strikes and ruling on witness examination; and (4) should be fully disclosed to the jury at the start of the trial. *Smithwick*, 724 S.W.2d at 8–11.

**20.** We previously condemned the practice of buying a witness' testimony in order to silence testimony. *Tom L. Scott, Inc. v. McIlhany*, 798 S.W.2d 556, 560 (Tex.1990).

Mary Carter agreements. Equalizing peremptory strikes, reordering proceedings, thoroughly disclosing the true alignment of the parties, and revealing the agreement's substance cannot overcome collusion between the plaintiff and settling defendants who retain a financial interest in the plaintiff's success. In fact, Mary Carter agreements may force attorneys into questionable ethical situations under Rule 3.05 of the Texas Disciplinary Rules of Professional Conduct, which is titled "Maintaining the Impartiality of the Tribunal." Comment 2 to that rule notes, regarding alternate methods of dispute resolution (like Mary Carter agreements), that "a lawyer should avoid any conduct that is or could reasonably be construed as being intended to corrupt or to unfairly influence the decisionmaker." *See* SUPREME COURT OF TEXAS, TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT art. X, § 9 (1990); *cf.* MODEL CODE OF PROFESSIONAL RESPONSIBILITY EC–720 (1979) (attorneys responsible for upholding adversarial system). The dissent acknowledges that Mary Carter agreements skew the trial process. This effect reasonably could be construed as unfairly influencing the decisionmaker.

■ As a matter of public policy, this Court favors settlements, but we do not favor partial settlements that promote rather than discourage further litigation. And we do not favor settlement arrangements that skew the trial process, mislead the jury, promote unethical collusion among nominal adversaries, and create the likelihood that a less culpable defendant will be hit with the full judgment. The bottom line is that our public policy favoring fair trials outweighs our public policy favoring partial settlements.

This case typifies the kind of procedural and substantive damage Mary Carter agreements can inflict upon our adversarial system. Thus, we declare them void as violative of sound public policy.

■ However, we do recognize the hardships that our decision today will create on our already burdened courts. Thus, we must decide whether our decision voiding Mary Carter agreements will apply prospectively or retrospectively. Although our decisions usually apply retrospectively, exceptions are recognized when considerations of fairness and policy dictate prospective effect only. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 434 (Tex. 1984). In *Carrollton Farmers Branch Ind. School Dist. v. Edgewood Ind. School Dist.*, 826 S.W.2d 489, 518–19 (Tex.1992), we adopted the three factors from the United States Supreme Court's decision in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971) to determine whether to apply a decision prospectively or retroactively. These factors are: (1) whether the decision establishes a new principle of law by either overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) whether prospective or retroactive application of the particular rule will further or retard its operation through an examination of the history, purpose, and effect of the rule; and (3) whether retroactive application of the rule could produce substantial inequitable results. *Id.*

■ The first and the third of these factors weigh clearly in favor of a determination of prospective application. This case represents an issue of first impression whose resolution was not clearly foreshadowed. Although commentators have routinely criticized the Mary Carter agreement, only a couple of states have previously held that such agreements are void.[21] The only Texas opinion which even hinted that such agreements might be void, was Justice Spear's concurrence in *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 8

---

21. The agreements are void in Nevada and Wisconsin. *Lum v. Stinnett*, 87 Nev. 402, 488 P.2d 347 (1971); *Trampe v. Wisconsin Tel. Co.*, 214 Wis. 210, 252 N.W. 675 (1934). Oklahoma reached a similar result by holding that a trial court must *"either hold that portion of the agree-*

*ment granting agreeing defendant an interest in a large plaintiff's verdict unenforceable as against public policy, or dismiss the agreeing defendant from the suit."* Cox v. Kelsey–Hayes Co., 594 P.2d 354, 359 (Okl.1978) (emphasis in original).

(Tex.1986) (on motion for rehearing). Therefore, we conclude that the first factor weighs heavily in favor of prospective application. The third factor likewise weighs heavily in favor of prospective application because retroactive application would create substantial inequitable results for litigants who would have to re-try their cases and re-enter the clogged court dockets of this state when they could not have known that such agreements would be held to be void as against public policy. The second factor favors retroactive application of the rule since the rule is designed to prevent unfair trials resulting from the use of Mary Carter agreements. However, as we discussed in *Edgewood*, 826 S.W.2d at 519 n. 36, all *Chevron* factors are not required to favor prospectivity: we engage in a broad balancing of the factors to determine the ultimate considerations of fairness and policy. We conclude that the strength of the first and third factors outweigh the second factor.[22] Thus, we declare, as a matter of sound administration and fairness, that this holding shall be applicable only in the present case, to those cases in the judicial pipeline where error has been preserved, and to those actions tried on or after December 2, 1992.[23]

### V.

■ In short, the evidence in the record creates a fact issue of comparative causation. The jury should have been allowed to pass not only on Drs. Elbaor's, Syrquin's, and Stephens' alleged negligence, but also on Ms. Smith's alleged negligence. Under this record, the trial court should have left these fact issues for the jury's resolution within the framework of our well-established comparative negligence law. The failure to submit the issues was calculated to cause, and probably did cause, the rendition of an improper judgment in this case. TEX.R.APP.P. 81. The danger in allowing the trial court's action to stand uncorrected is that this would indicate that patients who refuse to take medication necessary to their recovery are not contributorily negligent even though their unwillingness may have causally contributed to their injuries. Additionally, the judgment in this case was fundamentally driven by Mary Carter agreements. However, because of the existence of a severability clause in some of the agreements but not others and the creation of a financial stake for some defendants in Ms. Smith's lawsuit but not in others, they must be treated separately.

■ *Agreement between Ms. Smith and Arlington Community Hospital:* Because of the severability clause, the portion of the agreement between Ms. Smith and ACH creating ACH's financial stake in the outcome of the case and requiring ACH to participate in the trial is severed from the rest of the agreement and held null and void.

■ *Agreement between Ms. Smith and Dr. Syrquin:* This agreement did not contain a severability clause but Dr. Syrquin retained a financial state in Ms. Smith's lawsuit and was required to participate in the trial. The portion of the agreement granting Dr. Syrquin a financial stake in Ms. Smith's lawsuit is nonetheless held null and void. So as not to interfere with the parties' right to contract, we leave it to the parties, if they so choose, to develop before the trial court whether this void provision is severable, or whether the entire agreement must fail.

■ *Agreement between Ms. Smith and Dr. Stephens:* This agreement did not create a financial stake for Dr. Stephens in

---

**22.** Several federal cases have similarly held that the first and third prongs can mandate prospectivity even when the second prong favors retroactivity. *See Silverman v. Barry,* 845 F.2d 1072, 1085–86 (D.C.Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 394, 102 L.Ed.2d 383 (1988); *Barina v. Gulf Trading & Transp. Co.,* 726 F.2d 560, 564 (9th Cir.1984); *Stretton v. Penrod Drilling Co.,* 701 F.2d 441, 445–46 (5th Cir.1983).

**23.** The complaining party on appeal is not relieved of the standard appellate requirements of preservation of error and establishing that the error "was reasonably calculated to cause and probably did cause the rendition of an improper judgment." TEX.R.APP.P. 81(b) & 184(b); *see also* TEX.R.APP.P. 52. In this case, we determine that the use of the Mary Carter agreement at trial was harmful error for the reasons stated in section III of this opinion.

Ms. Smith's lawsuit. Thus, this agreement does not meet the test for a Mary Carter agreement.

 In summary, a settling defendant may not participate in a trial in which he or she retains a financial interest in plaintiff's lawsuit. Since Dr. Stephens does not have a financial interest in Ms. Smith's lawsuit, there is no impediment for him to participate fully in the re-trial of this case as any other party. ACH possesses a financial interest in Ms. Smith's lawsuit, but it can also participate in the re-trial of the case because we have severed the portion of the agreement creating ACH's financial stake in the outcome of the case from the remainder of the settlement. Likewise, Dr. Syrquin does have a financial interest in Ms. Smith's lawsuit and was required to participate in the trial. We have held the portion of the agreement granting Dr. Syrquin a financial interest in Ms. Smith's cause of action against Dr. Elbaor null and void. However, his future participation in the re-trial of this case has yet to be determined. After a hearing, if the trial court invalidates the entire agreement for lack of consideration or for some other reason, Ms. Smith is obligated to return the settlement funds to Dr. Syrquin and he is free to participate in the re-trial of this cause as any other party. Accordingly, we reverse the judgment of the court of appeals and remand this cause to the trial court for further proceedings consistent with this opinion.

DOGGETT, J., dissents and files opinion joined by MAUZY and GAMMAGE, JJ.

DOGGETT, Justice, dissenting.

Today a medical doctor is prohibited from participating in the trial of a lawsuit in which he is a defendant. This extraordinary and unprecedented maneuver is rooted in the majority's growing distrust of our jury system—its unfounded belief that twelve ordinary citizens are incapable of assessing facts after full disclosure of all the surrounding circumstances. Plunging helter-skelter into uncharted territory to save another medical doctor that a jury found to have committed malpractice, the majority writes without regard to the chaotic effect of its ruling on both the retrial of this action and other complex litigation pending across Texas. Because today's decision only serves to inject uncertainty and unfairness into trials, I dissent.

I.

At the outset let it be clear that I am opposed to litigation agreements in any form that "skew the trial process, mislead the jury" or endanger the public. At 250. A lawsuit is more than a battle of private contestants; it is conducted in a taxpayer-funded forum with the involvement of public employees and invested with a public interest. Careful scrutiny is appropriate for agreements with a potential to distort the search for truth that lies at the heart of the litigation process, and public policy will sometimes require their disapproval. *See, e.g., Tom L. Scott, Inc. v. McIlhany,* 798 S.W.2d 556, 560 (Tex.1990) (orig. proceeding) (invalidating a private agreement permitting one party from purchasing control of an opponent's expert witnesses).[1] Just as litigants can no longer enter legally enforceable agreements to bar the public's right to know about the dangers to health and safety lurking in discovery documents, *see* TEX.R.CIV.P. 76a, they should not be permitted to distort their relationship with one another in the courtroom so as to subvert a fair trial. Usually before invalidating such an agreement, however, we first ascertain whether the integrity of the judicial process can be preserved through reasonable procedural safeguards. *See Cypress Creek Util. Serv. Co. v. Muller,* 640 S.W.2d 860, 866 (Tex.1982) (noting that procedural modifications are preferable to changes in the substantive law in protecting against potentially collusive trial tactics). Here a procedural remedy was adequate; the trial judge handled this matter in a responsible manner. The truth finding

---

1. In a number of differing circumstances we have also found otherwise freely-entered contracts to be void as contrary to public policy.

*See Williams v. Patton,* 821 S.W.2d 141, 147–48 & n. 11 (Tex.1991) (Doggett, J., concurring).

process was appropriately preserved, but, dissatisfied with the truth determined, the majority once again overrules precedent to achieve a desired result.

### A.

Although Carole Smith non-suited Dr. Stephens and Dr. Syrquin, they remained as parties because Dr. Elbaor chose to maintain cross-actions against them. The majority remands for perhaps the first trial in Anglo–American jurisprudence in which a named party is denied a right to participate.[2] In so doing, the court has created a precedent which could inflict "malignant effects" on our adversarial system far more severe than those potentially created by the Mary Carter agreements it denounces. *See* at 249. The majority denies Dr. Syrquin an opportunity to protect his professional standing by participating at trial.[3] His reputation in the community as a physician has been hereby declared legally worthless, and any effect a jury verdict attributing significant negligence to him may have on hospital privileges, the cost and availability of malpractice insurance, and their patients is completely ignored. Normally one whose reputation is on trial may assert a right of intervention, *see* 1 ROY W. McDONALD, TEXAS CIVIL PRACTICE IN DISTRICT AND COUNTY COURTS § 3.47 (rev. 1991), but this doctor is left defenseless on retrial. The majority can point to no legal authority justifying this rash action. Today's declaration is contrary to every prior Texas decision, all of which have upheld a trial court's discretion in allowing named defendants to participate at trial in a Mary Carter setting where the nature of their involvement is fully disclosed to the jury. *See Adams v. Petrade Int'l, Inc.,* 754 S.W.2d 696, 718 (Tex.App.—Houston [1st Dist.] 1988, writ denied); *American Cyanamid Co. v. Frankson,* 732 S.W.2d 648, 655 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.); *Browning–Ferris, Inc. v. Mack Trucks, Inc.,* 714 S.W.2d 405, 406–07 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.); *McAllen Kentucky Fried Chicken No. 1 v. Leal,* 627 S.W.2d 480, 484 (Tex. App.—Corpus Christi 1981, writ ref'd n.r.e.). In concluding otherwise, the majority refuses to recognize a central tenet of our judicial system—those called into court should be allowed to answer.

### B.

Originating in *Booth v. Mary Carter Paint Co.,* 202 So.2d 8 (Fla.Dist.Ct.App. 1967), *overruled by Ward v. Ochoa,* 284 So.2d 385, 388 (Fla.1973), the term "Mary Carter agreement" has been loosely applied to agreements by which a defendant, after settling with the plaintiff, nonetheless participates at trial and obtains an interest in the plaintiff's recovery. *See* Robin Renee Green, Comment, *Mary Carter Agreements: The Unsolved Evidentiary Problems in Texas,* 40 BAYLOR L.REV. 449, 451 (1988). Such arrangements appear in myriad forms, with courts disagreeing over which might violate public policy.[4] While

---

**2.** In an attempt to escape this extraordinary effect of its writing, the majority shifts responsibility for excluding Dr. Syrquin to the trial court. Under today's writing, Dr. Syrquin may defend himself only if he gives up his stake in the recovery or the trial court compels Smith to return the equivalent of the $350,000 she received over three years ago, at the start of this protracted lawsuit, which today's holding may prolong for many more years. By invalidating only those agreements that both give the settling defendant a financial stake in the plaintiff's recovery *and* require its participation at trial, the majority creates a confusing array of choices for the trial court, all of which appear to involve unjust results. Among these potential outcomes are that a named party cannot participate at trial, a settling party must return all of its settlement proceeds, or a settling defendant must give up the financial stake that was an integral part of its consideration for settling.

**3.** In their brief Drs. Syrquin and Stephens emphasized an "interest in this case based on their need to protect their professional reputations."

**4.** *See Abbott Ford, Inc. v. Superior Court,* 43 Cal.3d 858, 239 Cal.Rptr. 626, 633, 741 P.2d 124, 131 (1987) (noting the "enormous variety of contractual arrangements" that are considered Mary Carter agreements); *Cox v. Kelsey–Hayes Co.,* 594 P.2d 354, 354 (Okla.1978); David Jonathan Grant, Comment, *The Mary Carter Agreement—Solving the Problems of Collusive Settlements and Joint Tort Actions,* 47 S.CAL.L.REV. 1393, 1409 (1974); *see also General Motors Corp. v. Lahocki,* 286 Md. 714, 410 A.2d 1039, 1042 (1980) ("It is probably safe to say that no two

considering whether a Mary Carter agreement from an earlier proceeding is admissible at a later trial in *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1 (Tex.1986), we referenced competing policy concerns involved with such arrangements. Although presenting "the potential [for a jury verdict] being obtained without full and fair litigation," we concluded that these agreements were advantageous in "encouraging settlements" and should be permitted "for public policy reasons." *Id.* at 7. Relying on this endorsement of Mary Carter agreements, Texas litigants have continued to enter into them as a matter of course. Today the majority overrules *Smithwick* and disregards the practical consequences for those who mistakenly believed that precedent still had meaning in Texas.[5]

The chief problem associated with a Mary Carter agreement is that a hidden alteration of the relationship of some of the parties will give the jury a misleading and incomplete basis for evaluating the evidence. As is true in so many areas of jurisprudence, secrecy is the first enemy of justice. To address this concern, trial judges have appropriately implemented several procedural safeguards that remove the veil of secrecy from such settlements. Accordingly, we have emphasized the importance of complete disclosure of these arrangements. *General Motors Corp. v. Simmons*, 558 S.W.2d 855, 858–59 (Tex. 1977), *overruled on other grounds by Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 427 (Tex.1984). A concurrence to *Smithwick* suggested a number of specific protections regarding such agreements: discovery of them by the non-settling parties; their pretrial disclosure to the court; thorough explanation of the nature of their terms to the jury at the beginning of the trial; and restriction of a settling defendant's leading questions of the plaintiff's witnesses. 724 S.W.2d at 9–11 (Spears and Gonzalez, JJ., concurring).[6]

In the instant case the trial court took great care to safeguard procedurally the adversarial nature and fairness of its proceedings. Nothing about the agreements now under attack was hidden from anyone.[7] The court appropriately solicited and welcomed suggestions from Elbaor and the other parties as to what and when to tell the jury about the Mary Carter agreements.[8] At voir dire, the court informed prospective jury members that ACH and Syrquin, by participating in the trial, could recover all or a portion of the amounts paid in settlement to Smith, depending on the size of the verdict.[9] An additional warning

---

pacts dubbed [a] 'Mary Carter Agreement' have been alike."). For an example of a dispute over whether an agreement constitutes a Mary Carter agreement, see *City of Houston v. Sam P. Wallace & Co.*, 585 S.W.2d 669, 673–74 (Tex.1979).

**5.** Ignoring our unequivocal approval of Mary Carter agreements in *Smithwick*, the majority disguises its disavowal of precedent with the claim that "[o]ur inaction has created confusion." At 248. The suggestion that anyone outside this court was "confused" is insupportable. Neither *Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696 (Tex.App.—Houston [1st Dist.] 1988, writ denied), nor *Lubbock Mfg. Co. v. Perez*, 591 S.W.2d 907 (Tex.Civ.App.—Waco 1979, writ dism'd by agr.), purports to say that this court has not approved such agreements.

**6.** Citing *Simmons*, 558 S.W.2d at 858–59; *Sam P. Wallace & Co.*, 585 S.W.2d 669 (Tex.1979); *Clayton v. Volkswagenwerk*, 606 S.W.2d 15 (Tex. Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.); *Greiner v. Zinker*, 573 S.W.2d 884 (Tex. Civ.App.—Beaumont 1978, no writ); David R. Miller, Comment, *Mary Carter Agreements: Unfair and Unnecessary*, 32 Sw.L.J. 779 (1978). *See*

also Richard Casner, Note, *Admission into Evidence of a Mary Carter Agreement from a Prior Trial is Harmful Error*, 18 Tex.Tech L.Rev. 997, 1004–05 (1987).

**7.** The settling parties appear to have been open regarding these Mary Carter agreements from the outset, fully disclosing their arrangements to Elbaor and the court prior to trial. While ruling on pretrial motions, the trial court explained its intent to "minimize [any] possible adverse effect [by making] known the essential elements of the Mary Carter agreement to the jury."

**8.** For instance, in response to the court's request for "any ideas about a specific instruction," Elbaor's counsel responded that "the way to handle this is just telling [the jury] that depending upon the amount of money that is awarded, Dr. Syrquin stands to get all of his money back and the hospital stands to get a percentage of it, a third of their money back."

**9.** The court explained:

You are informed that the settlement agreement between Carole Smith and Defendants

was extended regarding the possibility of witness bias arising from the agreements.[10] The implications of the agreements were also explored by various counsel during voir dire.[11]

To offset any disadvantage to Elbaor resulting from the agreements, the trial court gave him the same number of peremptory challenges as those of Smith and the three settling defendants together. Recognizing that these settling parties effectively were no longer aligned against one another, the trial court denied them the customary right of an opponent to lead each other's witnesses. Finally, the order of presentation was changed to guarantee that Elbaor always had the final opportunity to present evidence and examine witnesses. While Elbaor specifically complains of a lack of forcefulness in Smith's assertion of her claim against Syrquin, her counsel criticized Syrquin beginning in voir dire, though crediting his efforts to save Smith's life. Since in some multi-party suits co-defendants become aligned against one another, Elbaor might have found Syrquin and Stephens blaming him for Smith's injury even in the absence of the Mary Carter agreements.[12] Despite Elbaor's

concession that "[t]he trial court [correctly] followed Texas law when it disclosed the Mary Carter agreements and implemented the other procedures to protect [him]," [13] the majority rejects these procedures as "miss[ing] the point," At 248, thereby renewing its commitment to limit the role of the jury in the truth-seeking process. *See LeLeaux v. Hamshire–Fannett Sch. Dist.,* 835 S.W.2d 49, 56 (Tex.1992) (Doggett, J., dissenting). Simply because jurors may initially expect the plaintiff to have interests adverse to all defendants does not mean that they are incapable of understanding that certain defendants have an incentive for the plaintiff to succeed. Indeed the same may occur in some multiparty litigation where no Mary Carter agreement is involved. The trial cannot be a "sham of adversity," At 249, when the jury, as here, is fully aware of this shift in alliances. Nor does the trial become less adversarial merely because some of the parties have switched sides—the names may have changed but the struggle is left intact. So long as at least two parties with antagonistic interests remain, the likelihood that the truth will emerge is not diminished.[14]

10. The court informed the panel:

Abraham F. Syrquin, M.D. and [ACH] provides that these Defendants will be paid back all or a portion of the amount which they have paid in settlement to Carole Smith in the event the jury returns a verdict that exceeds a certain size. The formula by which these Defendants will be paid back ... is calculated on the basis of the amount by which the verdict exceeds a floor amount.

10. The court informed the panel:

If you are selected as a juror in this case, you will have a responsibility to evaluate the testimony of witnesses. In making that evaluation, you should know that some of the parties have, in effect, made a settlement and that they stand to receive a portion or all of that settlement back, depending on the answers the jury makes to the special issues in this case.

Counsel for Elbaor on voir dire also addressed this issue:

Now, the settlement, as the Judge said to you, Ms. Smith has filed this lawsuit against all of these Defendants, and they are all called Defendants, but as you may have noticed, and I am sure you did, the other lawyers who have spoken to you so far all have a common theme.... Dr. Elbaor done it. Why? Well,

that again goes back to motivation. Credibility of witnesses. They've got a stake in the outcome.

Elbaor's attorney again stressed this reason for bias in his closing argument.

11. A specific query was made as to whether "there [was] anybody on the jury panel who would have any difficulty in following Judge Crowley's instructions" regarding the agreement.

12. While deploring the "distorted" nature of the jury trial and verdict, the majority never considers the jury's findings that Dr. Syrquin's substandard medical care caused twelve percent of Smith's damages; this is a circumstance hardly suggestive of jury bias in favor of Dr. Syrquin.

13. App. for Writ of Error at 35. Elbaor adds that "[n]o party to this appeal is complaining that the trial court erred in adopting procedures to minimize the harmful effect of the Mary Carters...." *Id.*

14. "The theory of the system is that in the contest between the parties, each interested to demonstrate the strength of his own contentions and to expose the weakness of his opponent's, the

Accordingly, most jurisdictions allow Mary Carter agreements when trial courts implement similar procedural safeguards to those adopted here. *See Simmons,* 558 S.W.2d at 858 ("Most courts that have addressed the issue, while not declaring these agreements void, have permitted the disclosure of the contracts to the jury when offered by a nonsettling defendant."); *Slusher v. Ospital,* 777 P.2d 437, 441–42 (Utah 1989) ("[t]he current approach is to validate *Mary Carter* agreements ... but to require that they be fully disclosed"); *Bass v. Phoenix Seadrill/78, Ltd.,* 749 F.2d 1154, 1158 n. 7 (5th Cir.1985) ("properly disclosed Mary Carter agreements serve a legitimate function"). In rejecting the full disclosure approach, today's opinion embraces a decidedly minority view accepted in only "a couple of states" that have previously chosen to prohibit such agreements. *See* at 250.[15] Indeed, the majority cannot point to a single case in any jurisdiction that has ever approved today's prohibition of a named party from participating at trial because of a disclosed pretrial agreement.

### C.

The imprecise form of today's condemnation of Mary Carter agreements for "mak[ing] litigation inevitable," At 248, ensures that litigation will indeed be inevitable.[16] For cases pending "where error has been preserved", and in the future,

agreements that call for settling defendants with a financial stake in the plaintiff's recovery to participate at trial are declared "void." *Id.* at 250. Since the type of objection sufficient to preserve error is never explained, neither litigants nor trial courts will be certain for which particular cases this holding applies. Nor is the mandate of this holding clear. For any pending litigation in which a defendant has already compensated the plaintiff, must this fruit of a "void" contract be returned? If so, in order to avoid reexposure to liability may the settling defendant reject this repayment? May a plaintiff who obtains a judgment refuse with impunity to pay the "void" but previously agreed portion to the settling defendant? If only that portion of the agreement calling for the defendant's participation at trial is void, has settlement been negated by failure of consideration? Litigants will waste their own resources and those of the judicial system while exploring the implications of today's rulings on such questions, which the majority deliberately refuses to answer.

Furthermore, the majority seeks to expand the scope of its writing with an offhand notation attempting to restrict an attorney's ethical ability to present the testimony of a settling defendant. *Id.* at 247 n. 14. Application of Disciplinary Rule 3.04(b) when such testimony constitutes vital proof is, however, highly questionable. Settling

---

truth will emerge." Edmund M. Morgan, *Hearsay Dangers and the Application of the Hearsay Concept,* 62 Harv.L.Rev. 177, 185 (1948).

**15.** Nor with the safeguards adopted here would these particular agreements likely be voided even under the two cases cited by the majority. In *Lum v. Stinnett,* 87 Nev. 402, 488 P.2d 347 (1971), the court focused on the presence of "sham defendants." *Id.* 488 P.2d at 352. Here there was a direct cross-claim brought by Elbaor against Syrquin and Stephens. *Trampe v. Wisconsin Tel. Co.,* 214 Wis. 210, 252 N.W. 675 (1934), concerned the secretive manner in which an agreement was entered into and kept from the jury, the public and the press, facts clearly not present here.

**16.** Counsel for Elbaor admitted at oral argument that "a ruling in this case will be significant in terms of the impact that it's going to have on a lot of pending lawsuits." Between

June 1991 and June 1992, there were eight reported court of appeals decisions involving Mary Carter agreements. *See Contemporary Health Management, Inc. v. Palacios,* 832 S.W.2d 743 (Tex.App.—Houston [14th Dist.] 1992, no writ); *Barras v. Monsanto Co.,* 831 S.W.2d 859 (Tex.App.—Houston [14th Dist.] 1992, writ denied); *Mi–Jack Products, Inc. v. Braneff,* 827 S.W.2d 493 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Fletcher v. National Bank of Commerce,* 825 S.W.2d 176 (Tex.App.—Amarillo 1992, no writ); *Texas Utilities Elec. Co. Through Texas Power & Light Div. v. Gold Kist, Inc.,* 817 S.W.2d 749 (Tex.App.—Eastland 1991) *rev'd by* 830 S.W.2d 91 (Tex.1992) (per curiam); *Mt. Hawley Ins. Co. v. Ragland,* 1991 WL 159193 (Tex.App.—Austin 1991, vacated on settlement); *Highlands Ins. Co. v. New England Ins. Co.,* 811 S.W.2d 276 (Tex.App.—San Antonio 1991, no writ); *C & H Nationwide, Inc. v. Thompson,* 810 S.W.2d 259 (Tex.App.—Houston [1st Dist.] 1991, writ granted).

defendants may have retained a financial stake in the case in return for compensation, their help in procuring discovery, preparing for trial, *and* testifying. Their payment is not contingent solely on their status as a witness. Moreover, the testimony of an employee of a settling entity who does not personally retain any financial stake in the outcome of the case should not trigger the rule.

## II.

A further basis for the majority's rejection of this jury verdict is the supposed trial court error in not submitting a contributory negligence question based on the purported evidence that Smith's failure to take her antibiotics "preceded the onset of infection in the ankle." At 243. Yet Dr. Elbaor himself refutes any causal connection between this conduct and the injury which he admits "is attributable to the infection *which developed in the ankle while Ms. Smith was under the care of Dr. Syrquin.*" App. for Writ of Error at 4 (emphasis added). Smith first declined antibiotics on the very day that Dr. Elbaor assumed responsibility for her care.[17] The record contains no expert testimony establishing within reasonable medical probability that the infection developed during this limited window of time, foreclosing any possibility that Smith's conduct caused it. *See Lenger v. Physician's Gen. Hosp., Inc.,* 455 S.W.2d 703, 707 (Tex.1970) (evidence of "a possible cause of the condition cannot ordinarily be treated as evidence of reasonable medical probability").

Nor is there any evidence that the infection would have healed if Smith had faithfully taken her antibiotics and stopped smoking. Smith contends that her bone loss was caused by Elbaor's failure to perform necessary surgical procedures including debridement of the infected bone. Elbaor's own testimony established that antibiotics alone, without surgery, could not have cured the infection, but perhaps "could" have made the infection harder to treat.

Moreover, both he and other medical experts testified that antibiotics would have had difficulty reaching the infection in the bone because the blood supply to that area had been substantially restricted. Conceivably Smith's conduct affected the spread of infection, but this evidence would only support a jury instruction regarding her failure to mitigate damages rather than a submission of contributory negligence. *See Kerby v. Abilene Christian College,* 503 S.W.2d 526, 528 (Tex.1973). This is precisely the course that the trial court adopted. While Smith may arguably have *aggravated* the injury, there is no evidence that she caused all of the damages. While some of Smith's alleged conduct may have occurred during the same nineteen days she lay at the hospital without Elbaor attempting surgery, she certainly did not prevent or interfere with his undertaking appropriate treatment.

## III.

Texas has today become the first state in the nation to lock the courthouse door on a party solely because of a pretrial contract involving a partial settlement which the majority dislikes. The elitist view that ordinary people acting as jurors are incapable of determining the facts after full disclosure has once again prevailed. While protecting the litigation process from deleterious agreements, this court should avoid precipitous action with uncertain consequences for so many litigants, particularly when, as here, the parties have exercised considerable care and the trial court has conscientiously monitored the proceedings.

MAUZY and GAMMAGE, JJ., join in this dissenting opinion.

---

**17.** Syrquin turned Smith over to Elbaor's care on the afternoon of May 17. Only a few hours earlier that very morning Smith had first refused antibiotics to which she said she was allergic.