MARY'S OPINION HEADING 



 NO. 12-01-00023-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


THE STATE OF TEXAS,
§
 APPEAL FROM THE 

APPELLANT



V.
§
 COUNTY COURT AT LAW


DONALD L. DICK AND WIFE,

BARBARA JO DICK, AND DONALD

DICK D/B/A D & D AUTO SALES,

APPELLEES
§
 CHEROKEE COUNTY, TEXAS

 

 The State of Texas ("State") appeals from a condemnation proceeding in which Donald L.
Dick and Barbara Jo Dick ("the Dicks") were awarded $90,000.00 for the State's taking of the
parking spaces for their used car lot, for damages to the remainder of their used car lot, and lost
profits. In three issues, the State contends that lost profits were improperly considered by the jury,
that a venireman should have been excused for cause as a matter of law, and that pre-judgment
interest was improperly calculated. We reverse and remand for a new trial with instructions.


Background


 The Dicks operated a used car lot on a .54 acre tract of land at 714 West Larissa in
Jacksonville. The State, in widening U.S. Highway 79 through Jacksonville, condemned a .022 acre
strip of land formerly used by the Dicks for customer parking. Because the parties could not agree
on compensation for the Dicks' damages, the trial court appointed special commissioners to hear the
dispute. See Tex. Prop. Code Ann. § 21.014 (Vernon 1984). The Dicks were awarded $4,500.00
by the special commissioners. The Dicks timely filed an objection to this award. Tex. Prop. Code
Ann. § 21.018 (Vernon 1984).

 The day this condemnation proceeding came to trial, the State filed a motion to exclude
evidence. The State specifically asked the trial court to determine, in a pretrial hearing outside the
presence of the jury, whether the Dicks' evidence of lost income and profits due to construction
related injuries was inadmissible at trial. During this hearing, Mr. Dick testified that on "numerous
occasions" the State denied temporary access to their used car lot during its construction project
widening U.S. Highway 79. The State's rebuttal witness said he had not inspected the used car lot
during the construction period and could not contradict Mr. Dick's testimony regarding the State's
denial of temporary access to it. The trial court denied the State's motion to exclude the evidence
of lost profits and determined as a matter of law that the State had denied temporary access to the
used car lot during the construction process.

 Mrs. Dick later testified before the jury about the denial of access to their used car lot during
the State's construction period. She further testified that they had lost $55,000.00 of profits for the
years of 1995 and 1996. Both of the Dicks testified before the jury that the value of the used car lot
prior to this condemnation action by the State was $105,000.00. Mr. Dick testified the .022 acre of
land taken by the State had been used for five parking spaces with a value of $4,000.00 each, and
therefore, the total value of this .022 acre of land was $20,000.00. He then testified that the value
of the remaining .52 acre of land which constituted the used car lot itself had a pre-taking value of
$85,000.00. He further testified that it would cost $15,000.00 to remove the building on the used
car lot after the taking to make it marketable and that he could then sell the raw land of the .52 acre
for $70,000.00. His testimony was that the damage to the remainder of the used car lot was therefore
$30,000.00. The State's witness, Steve Campbell, testified the value of the .022 acre strip used for
parking by the Dicks was $2,104.00 and the damage to their remainder was $1,800.00. At the end
of the trial, the jury was asked to answer only two questions. It was asked to determine the value of
the parking spaces taken and the damage to the remainder of the used car lot. The jury's answer to
the former question was $3,904.00 and, to the latter, $86,096.00. The trial court entered judgment
on the jury's answers. The State timely filed this appeal.


Lost Profits and Temporary Denial of Access


 In its first issue, the State contends the trial court erred in admitting evidence of lost profits
during the trial before the jury and that it was further error for the jury to consider lost profits in
arriving at the value of the remainder of the Dicks' used car lot.

 In Texas, a person must be adequately compensated for his property which is taken or applied
for public use. See Tex. Const. art. I, § 17. This compensation is measured by the market value
of the land (or property) at the time of the taking by the condemning authority. City of Fort Worth
v. Corbin, 504 S.W.2d 828, 830 (Tex. 1974). The Texas Property Code also provides:


 (c) If a portion of a tract or parcel of real property is condemned, the special commissioners shall
determine the damage to the property owner after estimating the extent of the injury and benefit to the
property owner, including the effect of the condemnation on the value of the property owner's
remaining property.



Tex. Prop. Code Ann. § 21.042(c) (Vernon 2000). In addition to the compensation for property
taken and damages to the remainder of their property not taken, property owners may be entitled to
special damages under article I, section 17 of the Texas Constitution for temporary denial of access
to their property during a condemnor's construction activities. See State v. Heal, 917 S.W.2d 6, 9
(Tex. 1996); see also L-M-S Inc. v. Blackwell, 149 Tex. 348, 233 S.W.2d 286, 290-91 (1950).

 As a general rule, lost profits are not compensable under the Texas Constitution in a
condemnation proceeding. City of Austin v. Avenue Corp., 704 S.W.2d 11, 12 (Tex. 1986). 
However, there are three exceptions to this general rule on the introduction of lost profits into a
condemnation proceeding. The first and second exceptions come into play when the trial court finds
that there has been a material and substantial interference with access to the premises which can be
shown by either a total temporary or partial permanent restriction of access. See State v. Schmidt,
867 S.W.2d 769, 775 (Tex. 1993); City of Austin, 704 S.W.2d at 13. The third exception arises
when there has been a temporary restriction of access brought about by an illegal activity or one that
is negligently performed or unduly delayed. Id. The third exception is not alleged in the matter
before us, therefore, we will not consider it further.

 The general rule's first exception allowing recovery of lost profits is explained in Hart Bros.
v. Dallas County, 279 S.W. 1111 (Tex. Comm'n App. 1926, judgm't adopted). There, Dallas
County had condemned land leased by a partnership operating a combination livery stable and feed
store to make room for the West Dallas Pike. Id. The partnership, which leased the real property,
specifically sought lost profits because access to their livery stable/feed store was cut off during
construction of the pike's addition. Hart Bros., 279 S.W. at 1111-12. The Texas Supreme Court
adopted the commission's holding allowing recovery for lost profits when temporary access to a
business is denied by construction activities because that is property covered by article one, section
seventeen of the Texas Constitution. Id. at 1112.

 Our supreme court continues to follow this rule allowing evidence and recovery of lost profits
when there has been a total although temporary denial of access during a condemnor's construction
activity. See City of Austin, 704 S.W.2d at 13; Schmidt, 867 S.W.2d at 775. However, it has also
instructed trial courts to strictly "control the admission of evidence" of lost profits during
condemnation proceedings. State v. Wood Oil Distrib., Inc., 751 S.W.2d 863, 865 (Tex. 1988). The
question of whether there has been a material and substantial impairment of access is a question of
law. Id.; see also Heal, 917 S.W.2d at 9. The determination of access denial leading to admission
of lost profits evidence must be made before the trial begins. See Wood Oil Distrib. Inc., 751
S.W.2d at 865.

 In the instant case, this pretrial hearing on denial of access during the construction activities
widening U.S. Highway 79 was held on the State's motion. In support of his testimony about
numerous denials of access to his used car lot by the State during its construction activities, Mr. Dick
introduced four pictures showing piled dirt, road building equipment and construction cones
blocking access to his used car lot. The State's rebuttal witness testified he had not been to the
Dicks' used car lot during the State's construction activities and admitted Mr. Dick was in a better
position to testify whether there had been a temporary denial of access to his used car lot at 714 West
Larissa. We hold as a matter of law that the Dicks established a material and substantial impairment
of temporary access to their used car lot. Accordingly, the trial court did not err in admitting
evidence of lost profits during trial of this condemnation proceeding. See City of Austin, 704
S.W.2d at 13. The portion of the State's first issue as it relates to the trial court's finding of a
substantial and material denial of temporary access to the Dicks' used car lot is overruled.


Lost Profits and Damage to the Remainder


 We now consider whether it was error for the trial court to instruct the jury to consider lost
profits in answering the question of damage to the remainder, that is, the portion of the Dicks' used
car lot not taken by the State. The general rule's second exception allowing evidence and recovery
of lost profits is explained in the seminal case of City of Dallas v. Priolo, 150 Tex. 423, 242 S.W.2d
176 (1951). There, the City of Dallas had condemned the parking places of Priolo's grocery and
liquor business in order to widen Dolphin Road. Id. at 177. During this condemnation trial, Priolo
called a real estate dealer who testified the reduced market value of Priolo's remaining property was
attributable to the lost business or profits caused by the city's condemnation of the business's
parking places. The supreme court determined that this lost profits evidence was admissible to show
the market value of Priolo's remaining land and the purpose for which it had been adapted and put
to use. Id. at 179. Our supreme court continues to allow lost profits testimony as an element in
establishing the value of the remaining land not taken by a condemning authority. See City of
Austin, 704 S.W.2d at 13; Schmidt, 867 S.W.2d at 775.

 Mr. Dick testified during the pretrial hearing that the State temporarily denied him access to
his used car lot on numerous occasions during the construction process. However, during neither
the pretrial hearing nor the jury trial itself did Mr. Dick testify as to the effect that the State's taking
of his parking spaces had on the value of the remainder of the land where his used car lot was
located. He based his testimony regarding the value of the remainder of his land on what he could
sell the raw land for after removing the now useless improvements still situated on it. In fact, Mr.
Dick never testified about lost profits during the trial. Although Mrs. Dick did testify on lost profits
for 1995 and 1996, she did not attempt to tie them into how she arrived at her determination of the
value of the remainder of the used car lot. In fact, she specifically testified that they were seeking
loss of income "separate and independent" from the value of the used car lot.

 The Dicks' testimony therefore contrasted with that of the real estate dealer in Priolo. There,
the real estate dealer specifically testified on the value of the parking spaces and how that went into
his value determination for the strip of land taken by the condemning authorities. Priolo, 242
S.W.2d at 178. In Priolo, in contrast to the instant case before us, the real estate dealer then went
further in his testimony by showing the specific effect of the loss of the parking spaces on the
grocery and liquor store businesses. Id. The real estate dealer's quantification of how profits were
lost due to the loss of the businesses' parking spaces allowed the supreme court to approve the use
of lost profits in determining the value of the remainder of property in a condemnation proceeding. 
See id. at 179. In the Dicks' case, neither of them quantified the impact of losing the five parking
spaces on the value of their used car lot. All we know from their testimony is that they had lost
$55,000.00 of profits in 1995 and 1996. Neither showed how the loss of profits for these two years
impacted the value of the remainder of their used car lot as was done in Priolo. During his closing
argument to the jury, the Dicks' attorney separated lost profits from the damage to the remainder of
the used car lot. He described these as separate "elements," asking for $30,000.00 as damage to the
remainder and $55,000.00 for lost profits. We further note the Dicks conceded during oral argument
there was no evidence tying lost profits to the value of the remainder of their used car lot. The Dicks
only attempted to tie evidence of lost profits to the first exception to the general rule disallowing lost
profits, that is, based on a total but temporary denial of access during construction. They did not
attempt to tie evidence of lost profits to the second exception, that is, to show reduced market value
of the remainder.

 There must be evidence to support an instruction given by the trial court for a question
submitted to the jury. Tex. R. Civ. P. 278; see also Elbaor v. Smith, 845 S.W.2d 240, 243 (Tex.
1992). Here, there is no evidence to support the instruction that the jury could consider lost profits
to determine the value to the remainder of the Dicks property not taken by the State. The State
objected to this instruction during the jury charge conference on the basis there was no probative
evidence to support it. We hold it was error for the trial court to instruct the jury to consider the loss
of profits when answering the question on the value of the remainder of the Dicks' used car lot. See
Elbaor, 845 S.W.2d at 243.

 Based upon our holdings, the State's issue one as it relates to the jury charge on lost profits
is sustained, but on all other matters is overruled.


Venireperson Tipton


 In its second issue, the State contends that venireperson Tipton should have been dismissed
from the jury panel as a matter of law because of his bias or prejudice favoring the Dicks. It argues
that, once bias was shown, the trial court had no discretion in the matter and the attempt to
rehabilitate Tipton was improper.

 We review a trial court's decision regarding challenges for cause for an abuse of discretion. 
Keifer v. Continental Airlines, Inc., 10 S.W.3d 34, 39 (Tex. App.-Houston [14th Dist.] 1999, pet
denied). Bias is an inclination toward one side of an issue rather than the other. Compton v. Henrie,
364 S.W.2d 179, 182 (Tex. 1963). Prejudice is more easily defined as it means prejudgment, and
consequently embraces bias. Id. A juror who shows bias or prejudice in favor of or against a party
should be removed for cause. Tex. Gov't Code Ann. § 62.105(4) (Vernon 1998). A challenge for
cause is defined as "an objection made to a juror, alleging some fact which by law disqualifies him
to serve as a juror in the case." Tex. R. Civ. P. 228.

 During its voir dire in the instant case, the State gave its rendition of the classic definition
of "market value" as used in condemnation cases in Texas over the past three generations: 


 You are instructed that the term "market value" is the price which the property will bring when offered
for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy,
but is under no necessity of buying.



See State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194, 202 (Tex. Comm'n App. 1936). A similar
definition was later provided to the jury in its charge at the end of the instant trial.

 When the State asked if any venireperson believed this definition was unfair in determining
what the Dicks' compensation would be, venireperson Tipton responded that he did.


 THE STATE: Can you tell me why?


PANELIST TIPTON: Because he's not a willing seller.


 THE STATE: Because he's not a willing seller?


PANELIST TIPTON: That is correct.


 THE STATE: Do you think that he should receive a premium-


PANELIST TIPTON: Correct.



 At this juncture in the questioning, the State asked to approach the bench with Tipton and
promptly moved to strike him because of his disagreement with the "market value" instruction the
jury would receive from the trial court at the end of the trial. At this time, the attorney for the Dicks
asked permission of the court to ask Tipton the following:


 THE DICKS: Your Honor, if I could, quickly- if the Judge instructed you to
review only the evidence that was presented and to follow his
instructions on giving your jury answers, do you think you could
do that?


PANELIST TIPTON: Yes, I could, but you're asking about a monetary value that's
going to be arbitrary. Yeah, I can be fair.



 A discussion then ensued in Tipton's presence, between the court and the attorneys for both
sides, as to whether this definition of "market value" was going to be part of the court's charge. 
Finally, the State asked Tipton the following question:


 THE STATE: Mr. Tipton, would it be hard for you to be impartial, with your
opinion that that's not a fair test, considering that it was not a
voluntary sale?


PANELIST TIPTON: Correct.



 The trial court then stated that he would withhold a ruling on the State's motion until the jury
panel was sent to lunch. He then told the parties' attorneys he would hear further argument at that
time. After both parties concluded voir dire, the trial court excused the entire panel for lunch with
the exception of Tipton. He remained in the courtroom with the parties' attorneys while all of the
other prospective jurors exited the courtroom. This second bench conference went as follows:


 THE COURT: We're back on the record in State of Texas v. Donald Dick, et
ux, et al. This is Mr. Tipton, prospective juror. Mr. Tipton,
when you were last in here, you told me and the respective
attorneys that you could not - correct me if I'm wrong - that you
could not be fair or you could not follow the Court's charge if the
test was a willing buyer - what a willing buyer would give for
condemned land - excuse me, what a willing buyer would give
for land and what a willing seller would sell it for.


PANELIST TIPTON: I believe I can be fair and impartial. I would just say, I would
always lean toward the person that I feel was wronged in the
case, and if someone didn't want to sell their land, I would lean
toward them. I'm not saying I wouldn't be fair about it.


 THE COURT: Well, you're saying one thing, and then you're saying something
else.


PANELIST TIPTON: I believe I can make a fair decision based on the evidence given.


 THE COURT: And you will be bound by the Court's charge?


PANELIST TIPTON: Yes.


 THE COURT: Question?


 THE STATE: Mr. Tipton, you did say that you would lean toward the party you
felt had been wronged, correct?


PANELIST TIPTON: Yes.


 THE STATE: And in this case, didn't you state earlier that since the landowner
was forced into the sale and wasn't willing, that would be the
wronged party in your mind?


PANELIST TIPTON: Not necessarily. I don't know what he was compensated.


 THE STATE: So the fact that he was forced and wasn't willing, you don't have
any qualms about applying a willing seller test when he, in fact,
was not willing at all to sell his property? In other words, you
don't have a problem with treating this valuation like a willing
seller, when he was not, in fact, willing?


PANELIST TIPTON: If that's what we have to go by, no. If the decision is based on
that, then that's the way I'll do it.


 THE STATE: Okay. Well, Your Honor, he's saying contradictory things, and
the State still moves to strike him.


 THE DICKS: Your Honor, I think his testimony speaks for itself. He's saying,
"I'm going to follow the Court's instructions. I may not like
them, but I'll follow them." If the requirement is that the
venireperson like what the instructions are - that can't be the law. 
It is, "Will you follow it?" He just said, "I will follow the
Court's instructions."


 THE COURT: Your motion is overruled.


 THE STATE: All right, Your Honor. I need to put on the record.


 THE COURT: Go ahead.


 THE STATE: Okay. The State is now going to be forced to used [sic] a
peremptory strike on Mr. Tipton, and that is going to preclude
the State from using a strike that it would otherwise have gotten
to use against Charlotte Louise Cummings. The reason the State
would have stricken Ms. Cummings, if it could have, if it had not
had to use one of its peremptory strikes on Mr. Tipton, was
because she was nodding affirmatively and frowning and giving
very clear body language when her next door neighbor, Ann
Hendry, was talking about the inconvenience of the road project
that forms the basis of this suit. She was also seen talking at
length with Ms. Hendry, apparently about the same issue. So she
was very negative about the State's road project in this case. So
now we will not get to use a peremptory strike on her, because
the Judge refused to strike Mr. Tipton for cause.



 The Dicks contend that it is a discretionary matter for the trial court to determine if a member
of the jury panel must be excused for bias or prejudice. They contend that once Tipton said in the
second bench conference that he would be "fair and impartial" and bound by the court's charge that
he was rehabilitated and the trial court could use its discretion to retain him on the jury panel. We
disagree. Bias or prejudice disqualifies a juror as a matter of law and removes all discretion from
the trial judge. Compton, 364 S.W.2d at 182. Once a perspective juror admits bias or prejudice, he
cannot be rehabilitated and affirmations that bias and prejudice can be set aside and the case decided
on the law and evidence must be entirely disregarded. W.D.A. v. State, 835 S.W.2d 227, 229 (Tex.
App.-Waco 1992, no writ.); Carpenter v. Wyatt Constr. Co., 501 S.W.2d 748, 750 (Tex. Civ.
App.-Houston [14th Dist.] 1973, writ ref'd n.r.e.). Even where such a juror is "rehabilitated"
through the efforts of counsel or the court by stating that he could be fair to both sides, the trial court
must excuse the juror. Gum v. Schaefer, 683 S.W.2d 803, 808 (Tex. App.-Corpus Christi 1984, no
writ).

 In the instant case, during the general voir dire and the first bench conference, Tipton clearly
showed an inclination toward the Dicks. Compton, 364 S.W.2d at 182. He should have been
excused at the end of the first bench conference as a challenge for cause should be determined by
the trial court "without delay." See Tex. R. Civ. P. 227. Once bias has been established, questioning
of a venireperson should not continue until he is worn down and says the magical words "fair and
impartial" and that he can be bound by the court's charge. We hold the trial court erred when it
failed to strike Tipton for cause. The State identified Cummings as a venireperson it would have
struck if it had not had to use one of its peremptory challenges on Tipton. It properly preserved for
appeal the error made by the trial court when it refused to strike Tipton for cause. See Shepherd v.
Ledford, 962 S.W.2d 28, 34 (Tex. 1998). The State's second issue is sustained.


Conclusion

 Because we have sustained the State's second issue and a portion of its first issue, we need
not address its issue three on pre-judgment interest. We reverse the judgment of the trial court and
remand for a new trial with instructions to consider the issues of the value of the land taken by the
State, the value of the Dicks' remainder, and any special damages caused by the State's temporary
denial of access to the Dicks' used car lot during the State's construction period.



 JIM WORTHEN 

 Justice



Opinion delivered December 21, 2001.

Panel consisted of Davis, C.J., Worthen, J., and Griffith, J.





















(PUBLISH)