

NUMBER 13-09-00446-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

CHRISTUS HEALTH SYSTEMS D/B/A
CHRISTUS SPOHN HOSPITAL CORPUS
CHRISTI - SHORELINE,                                    Appellants,

v.

MADISON "MATT" RAY HARLIEN AND
TAUNY L. HARLIEN,                                        Appellees.

On appeal from the County Court at Law No. 3
of Nueces County, Texas.

# MEMORANDUM OPINION

Before Chief Justice Valdez and Justices Rodriguez and Benavides
Memorandum Opinion by Justice Benavides

Appellant/cross-appellee, CHRISTUS Health Systems d/b/a CHRISTUS Spohn Hospital Corpus Christi–Shoreline ("Spohn"), appeals the judgment in this health care liability claim in which the jury awarded $362,000 in damages to appellee/cross-appellant, Madison "Matt" Ray Harlien.[1] By two issues, Spohn contends that: (1) the judgment was not supported by legally and factually sufficient evidence; and (2) although Mathew T. Alexander, M.D. settled with the Harliens before trial, the trial court nevertheless erred by not submitting the question of his negligence to the jury. By one cross-issue, Harlien contends that the evidence was not legally sufficient to support the jury's finding that Brent Hagemeister, M.D.'s negligence, as opposed to that of Spohn and its agents, was a proximate cause of sixty percent of Harlien's injuries. We affirm.

## I. BACKGROUND

Harlien, a former professional football player, underwent a ten-and-a-half hour spinal surgery at Spohn's Hospital in Corpus Christi, Texas. During the surgery, Harlien sustained injuries due to pressure created by the contact of his body with the surgical table and padding. Dr. Alexander, a neurosurgeon, performed the operation assisted by anesthesiologists Dr. Hagemeister and Eugene Theriot, M.D.—each of whom was present for only part of the surgery—as well as several nurses employed by Spohn, including Nanette Zamora, R.N., Becky Scoggin, R.N., and Becky Kowalczyk, R.N. In preparation for the surgery, Harlien was placed face-down on a "Jackson" table.

---

[1] Harlien's wife, Tauny Harlien, was also a party to this suit. However, the jury awarded her no separate damages, and she does not appeal the judgment on her separate claims.

2

According to the testimony adduced at trial, all types of surgical tables create pressure on the patient at the points where the table comes in contact with the body. A "Jackson" table, in particular, creates these pressure points at the chest and hips of the patient. Witnesses for Harlien indicated that both the length of the procedure and the physical characteristics of the patient can increase the risk of pressure-related injuries, and that Harlien was particularly susceptible to such injuries due to his weight of 400 pounds, his muscular build, and the fact that the procedure lasted over ten hours. The evidence showed that a patient must be repositioned throughout such a procedure between every two to six hours to prevent pressure sores and to allow circulation.

Harlien was not repositioned once during the surgery. As a result, Harlien suffered pressure sores on his chest and a type of nerve damage known as brachial plexus atrophy palsy affecting his extremities. The jury heard testimony that the nerve damage caused Harlien's arms to atrophy and that Harlien has become permanently disabled with little or no use of some of his fingers.

Harlien filed suit against Spohn for the negligence of its employee nurses; he also filed suit against Dr. Alexander, the neurosurgeon, and the anesthesiologists, Drs. Hagemeister and Theriot. Before the trial began, Dr. Alexander settled with Harlien, and Dr. Theriot was non-suited. Dr. Hagemeister settled before opening arguments to the jury began.

Harlien introduced two expert witnesses in his case-in-chief, John Sterling Meyer,

M.D.[2] and John Garino, M.D.[3]  The witnesses were accepted by the court as experts in neurology and anesthesiology, respectively.  Dr. Meyer was specifically instructed by the court not to testify as to the standard of care relevant to nurses.  Dr. Garino, however, was not so instructed and did in fact testify as to the applicable standard of care of nurses during such a procedure.  The following exchange occurred on direct examination:

> Q:    [Counsel for Harlien]   [B]ased on your participation in between 500 and a thousand spinal surgeries, are you familiar with the standard of care as it applies specifically to nurses and their responsibility to plan to prevent the formation of pressure points—pressure ulcers, nerve damage, and all other pressure related injuries in this type of procedure?
>
> A:    [Dr. Garino]   Yes, I am.
>
> Q:    Are you familiar, again, based on all of the previously listed experience with the standard of care as it applies to the Spohn nurses in the setting up of the padding for this type of procedure?
>
> A:    Yes, I am.
>
> Q:    Are you familiar with the standard of care as it applied to the nurses for the monitoring of pressure points and pressure-related injuries in

---

[2] The record indicated that Dr. Meyer is a board-certified neurologist, a professor of neurology at Baylor College of Medicine, and the Chief of Neurology at both Methodist Hospital and Ben Taub General Hospital in Houston.  He testified that he was "very" familiar with the "Jackson"-type table used during Harlien's surgery.  Spohn agreed at trial that he was "wonderfully qualified" to testify as to neurological questions as well as causation and damages but objected to him being qualified as an expert on the question of the nursing standard of care.  The Harliens' counsel agreed to limit the scope of Dr. Meyer's testimony, and accordingly, Spohn's objection was overruled.

[3] The record indicated that Dr. Garino is a board certified anesthesiologist with over twenty years' experience.  He testified that, over the course of his career, he has participated in between twelve and sixteen thousand procedures with between five hundred and one thousand of those being spinal surgeries. On cross-examination, he additionally testified that, though he does not have control of circulating nurses employed by other entities, he works collaboratively with them and supervises the nurse anesthetists in his own practice "almost on a daily basis."

> a procedure such as this one?
>
> A: Yes, I am.
>
> Q: And finally, are you familiar with the standard of care as it applies to the Spohn nurses['] obligation to [reposition] patients during the course of spinal surgery such as this one and thereby prevent pressure related injuries?
>
> A: Yes, sir.
>
> Q: And all of those opinions are based not only on your education and training but on your substantial experience in these types of procedures?
>
> A: Yes, that's true.

Dr. Garino then opined that the standard of care required Spohn's nurses to monitor pressure points, move the patient, and relieve pressure that built up during the procedure. He additionally testified that he believed that Harlien's injuries were caused by the negligence of Spohn's nurses in failing to satisfy that standard of care.

Additionally, Spohn called several witnesses, including Dr. Hagemeister and Nurses Scoggin, Zamora, Kwalzik, and an expert on nursing, Marla Loring, R.N. Each of these witnesses addressed the standard of care applicable to the nurses employed by Spohn, with the general consensus being that the anesthesiologist and nurses are responsible for repositioning a patient during a surgery like the one undergone by Harlien. In one such exchange, Nurse Scoggin testified as follows:

> Q: [Counsel for Harlien] And what the nursing staff is charged with is doing what the standards of care charges you and all of your nurses to do is to think in advance of the problems, because it doesn't do you any good to recognize it once it's there. Then all you can do is clean the wounds and hope that they heal. That's not what you

5

want to do, is it?

Q:      What you want to do, is it?

A:      [Nurse Scoggin] No, sir.

Q:      What you want to do and what the standard of care requires that you do is recognize he's a big man. It's a long surgery, and it's gone a lot longer than anticipated and reposition Mr. Harlien?

A:      Yes, sir.

Additionally, Nurse Loring's testimony indicated that the standard of care recognized by the Association of Operating Room Nurses ("AORN") required nurses to recognize that prolonged pressure could cause injury to patients and that repositioning should occur every two to four hours.

After hearing the evidence, the jury returned a verdict in which it found damages in the amount of $905,000. The jury found Dr. Hagemeister to be liable for sixty percent of the damages and found Spohn to be liable for forty percent of the damages. Spohn was ordered to pay its share of the damages in the amount of $362,000. Each party moved for a judgment notwithstanding the verdict ("JNOV"). Spohn argued that no evidence supported a finding of its liability and asked that the trial court enter a JNOV by which Harlien would take nothing. Harlien argued that no evidence supported the jury's finding that Dr. Hagemeister was liable for sixty percent of the damages and asked that the trial court enter a JNOV requiring Spohn to pay the entire amount of damages assessed by the jury. The trial court denied both motions for JNOV, and this appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

By its first issue, Spohn contends that the evidence was legally and factually insufficient to support the jury's verdict because Harlien did not present any competent evidence demonstrating the standard of care relating to Spohn's nurse employees. Specifically, Spohn contends that the testimony offered by Harlien's experts to establish a standard of care for its nurses was not competent evidence because Harlien's witnesses were not "nursing experts," and therefore, their testimony concerning the nursing standard of care amounted to no evidence.

### A. Standard of Review

When reviewing the jury's verdict for legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the jury's findings, giving full credit to all favorable evidence if any reasonable juror could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We will only reverse a jury's verdict based on a legal sufficiency challenge if: (1) there is a complete absence of evidence of a vital fact; (2) all the evidence offered to prove a vital fact amounts to only a mere scintilla and no more; (3) the rules of evidence forbid consideration of the only evidence offered to prove a vital fact; or (4) the evidence which the jury was compelled to consider and believe conclusively establishes the opposite of the vital fact. *Id.* at 810 & n.15-16.

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence, and we will only set aside the judgment if it is so contrary to the

overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). Under this standard, it is the jury's role, not this Court's, to judge "the credibility of the evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony." *Walker v. Ricks*, 101 S.W.3d 740, 749 (Tex. App.–Corpus Christi 2003, no pet.). We will not substitute our judgment for that of the jury. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

## B. Applicable Law

In a medical negligence claim, a plaintiff must establish legally sufficient evidence regarding the duty—or standard of care—that the health care provider owed to the patient. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008). Incompetent evidence is "insufficient to support a judgment, even if admitted without objection . . . [and] evidence showing it to be incompetent evidence cannot be disregarded, even if the result is contrary to the verdict." *City of Keller*, 168 S.W.3d at 812; *see also* W. Wendell Hall, et al., *Hall's Standards of Review in Texas*, 42 ST. MARY'S L.J. 3, 38-60 (2010) (discussing, at length, the Texas Supreme Court's requirements for sufficiency review of jury verdicts and specifically discussing the competency requirements for expert witnesses). "[W]hen expert testimony is required, lay evidence supporting liability is legally insufficient." *City of Keller*, 168 S.W.3d at 812. In order to determine the competency of an expert's testimony, we cannot view his opinion in isolation, but must consider other evidence that would tend to show the testimony is incompetent. *See id.*

8

at 813 (recognizing that evidence may seem to be competent when viewed alone but not when viewed in light of other evidence).   However, this competing evidence must show that the trial court abused its discretion in determining that a witness was qualified as an expert.   *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996).   Therefore, we will not disturb the trial court's determination unless it acted without reference to any guiding rules or principles.   *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

In a medical negligence claim, a professional need not be employed in the particular field about which he is testifying so long as he can demonstrate that he has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify him to give an opinion on that subject.   *Broders*, 924 S.W.2d at 153-54.   "[W]hen a party can show that a subject is substantially developed in more than one field, testimony can come from a qualified expert in any of those fields."   *Id.* at 154.

## C.   Discussion

Spohn argues that Dr. Garino's testimony was incompetent—and, therefore, amounted to no evidence—because he was not a nursing expert.   Spohn asks this Court to hold that the trial court abused its discretion in allowing Dr. Garino to testify as an expert on the standard of care applicable to nurses in this case, and additionally, asks us to hold his testimony incompetent as a matter of law.   We cannot so hold.

Dr. Garino testified that he had been involved in "between 500 and a thousand

9

spinal surgeries" as a board-certified anesthesiologist, and that it was both the anesthesiologists' and the nurses' joint responsibility to ensure that a patient was repositioned during a lengthy procedure. He also testified that he was familiar with the standard of care applicable to nurses based on his education, training, and his extensive experience with the type of procedure performed in this case, and that he supervised nurses in his own practice. *See* TEX. R. EVID. 702 (allowing experts to testify based on their "knowledge, skill, experience, training, or education"); TEX. CIV. PRAC. & REM. CODE ANN. § 74.402 (West 2010) (listing requirements for an expert to be qualified in a suit against a health care provider); *Broders*, 924 S.W.2d at 153-54.

Spohn urges this Court to find an abuse of discretion based on Dr. Garino's testimony on cross-examination wherein he agreed with Spohn's counsel that he was not holding himself out to be a "nurse expert"; that he was "not going to be offering opinions in this case regarding nursing and Texas law regarding nursing"; that he had "never been in charge of actually supervising circulating nurses"; and that he had never directed nurses on how to pad the specific "Jackson" type of table used during Harlien's procedure. However, this testimony is only indicative of the fact that Dr. Garino is not an expert on nursing generally, not that he was unqualified to testify about the very specific nursing standard of care relating to repositioning a patient during a lengthy procedure. Dr. Garino testified that although he did not have experience with the "Jackson" table, all surgical tables create pressure points in specific areas and require repositioning of the patient.

10

Spohn also argues that Dr. Garino's testimony as to the nurses' standard of care based on the fact that he has worked in the same room as them is analogous to "the surgical technician, charged with handing the surgeon the requested instruments, saying he is familiar with the standard of care for a circulating nurse because he has watched so many surgeries." We disagree. As we previously noted, Dr. Garino testified that the anesthesiologist and the nurses share the same standard of care with respect to repositioning the patient—unlike the spectating technician in Spohn's hypothetical. This view was also shared by several of Spohn's witnesses, including Dr. Hagemeister who testified that the nurse and anesthesiologist had "overlapping duties."

Based on the foregoing, it was within the discretion of the trial court to find that Dr. Garino was qualified to testify as to the appropriate standard of care for the nurses in this case. *See Broders*, 924 S.W.2d at 151. And, for these same reasons, the testimony advanced by Spohn in this case does not support the contention that Dr. Garino's testimony was incompetent as a matter of law. In so holding, we consider all of the evidence and find none that necessarily prevents Dr. Garino from being qualified as an expert on the nurses' standard of care in this case or from giving a competent opinion under Rule of Evidence 702 and section 74.402 of the Texas Civil Practice and Remedies Code. *See* TEX. R. EVID. 702; TEX. CIV. PRAC. & REM. CODE ANN. § 74.402; *City of Keller*, 168 S.W.3d at 812. Therefore, we conclude that the testimony was competent and legally sufficient to support the judgment.

Moreover, because Spohn's own witnesses agreed with Dr. Garino about the

11

nurses' standard of care—for example, when Nurse Scoggin testified that the standard of care required that she recognize that Harlien was "a big man"; that it was "a long surgery, and it [had] gone a lot longer than anticipated"; and that she "reposition Mr. Harlien"—and Spohn points to no additional evidence in the record that would discredit this testimony, we cannot say that the evidence in the record indicating a breach of the nurses' standard of care was so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Pool*, 715 S.W.2d at 635. Accordingly, we overrule Spohn's first issue.

### III. SUBMISSION OF THIRD-PARTY LIABILITY

By Spohn's second issue and Harlien's single cross-issue, each party contends that the trial court erred in submitting or failing to submit the question of the liability of third parties to the jury. Specifically, Spohn contends that the trial court erred by not submitting the question of settling codefendant Dr. Alexander's liability; and on the other hand, Harlien contends that the trial court erred in submitting the question of settling codefendant Dr. Hagemeister's liability because it was not supported by legally sufficient evidence.

### A. Standard of Review

If the admissible evidence at trial would support, by legally sufficient evidence, a finding that a settling codefendant was partially responsible for the harm alleged in the cause of action, the trial court must submit the question of the percentage of responsibility of each such party to the jury. TEX. CIV. PRAC. & REM. CODE ANN. § 33.003

12

(West 2010); *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992).  This Court will find such legally sufficient evidence only where "the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence." *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

## B.  Dr. Alexander

Spohn contends that Dr. Alexander's liability should have been presented to the jury because there was legally sufficient evidence to show that he:   (1) was ultimately responsible for the padding and positioning of Harlien on the surgical table; (2) breached the standard of care with respect to the padding and positioning on the table; and (3) this breach was a proximate cause of Harlien's injuries.   We disagree because there is no evidence to support the element of causation.   Despite the fact that the evidence established that Dr. Alexander was responsible for choosing the particular table to be used and that he was responsible for the initial padding and positioning of Harlien on that table before the procedure, no evidence was presented to show that these functions caused of any of Harlien's injuries.

Harlien's theory at trial was that it was the failure to *reposition* him that was the cause of his injuries, not that the table or padding was chosen or initially positioned improperly.   Spohn cites no relevant evidence in the record, and we find none, that supports the proposition that either the padding itself was the cause of Harlien's injuries, or that Dr. Alexander had a duty to monitor the pressure points on Harlien's body during the surgery.   *See Hamilton*, 249 S.W.3d at 426 (outlining the necessary elements that

13

must be shown to establish liability in a medical negligence claim).

Therefore, because legally sufficient evidence of Dr. Alexander's liability was not presented to the jury, it was not error for the trial court to refuse to instruct the jury on the question of Dr. Alexander's proportional liability. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003; *Elbaor,* 845 S.W.2d at 243. Accordingly, Spohn's second issue is overruled.

## C. Dr. Hagemeister

In stark contrast to the evidence supporting Dr. Alexander's liability, the evidence supporting Dr. Hagemeister's liability abounds in the record. As we noted above, several witnesses testified that it was the joint responsibility of the anesthesiologist and the nurses to reposition Harlien on the surgical table. In one such exchange, Dr. Garino, Harlien's anesthesiology expert, testified as follows:

Q: [Counsel for Harlien] Do you have an opinion as to whether or not it is reasonable and prudent for a nurse and/or an anesthesiologist to regularly relive pressure across the chest as you have suggested?

A: [Dr. Garino] Yes.

Q: What is that opinion?

A: That it is reasonable and prudent to be vigilant and monitor the pressure points to try to relieve that pressure in regular intervals, to document that process during the procedure.

Q: Do you have an opinion as to whether or not it is foreseeable if you fail to relieve the pressure across the chest, as you have suggested, that the risk of pressure-related injuries is extremely high in Mr. Harlien's particular case?

A: Yes, I do.

Q: And what is that opinion?

14

A:    Yes.   It is very high.   I think in any long procedure it's foreseeable [that] not relieving pressure points is going to cause a problem even in people not his size.   It's going to be an issue in a case more so in a large person.

Additionally, Dr. Hagemeister himself testified that he was responsible for moving the head, neck, shoulders, and possibly the arms of the patient and for monitoring pressure points.   This was clearly more than a scintilla of evidence to support the question of Dr. Hagemeister's liability as the primary anesthesiologist during the time in which Harlien's injuries occurred.   As such, the evidence furnished at least some reasonable basis for differing conclusions as to Dr. Hagemeister's proportional liability, and the question was properly submitted to the jury.   *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.003; *Elbaor*, 845 S.W.2d at 243; *Rocor Int'l, Inc.*, 77 S.W.3d at 262.   Accordingly, Harlien's cross-issue is overruled.

## IV.  Conclusion

Having overruled all of the parties' issues on appeal, we affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Delivered and filed the
9th day of June, 2011.

15