NUMBER
13-09-00446-CV

 

                                        COURT OF APPEALS

 

                     THIRTEENTH
DISTRICT OF TEXAS

 

                         CORPUS
CHRISTI - EDINBURG

                                                                      

 

CHRISTUS HEALTH SYSTEMS D/B/A

CHRISTUS SPOHN HOSPITAL CORPUS

CHRISTI - SHORELINE,                                                     Appellants,

 

v.

 

MADISON “MATT” RAY HARLIEN AND

TAUNY L. HARLIEN,                                                       
     Appellees.

                                                                      

 

On appeal from the County Court at Law No. 3 

of Nueces County, Texas.

                                                                  

 

MEMORANDUM OPINION

 

 Before
Chief Justice Valdez and Justices Rodriguez and Benavides

                      Memorandum
Opinion by Justice Benavides

 




Appellant/cross-appellee, CHRISTUS
Health Systems d/b/a CHRISTUS Spohn Hospital Corpus Christi–Shoreline (“Spohn”),
appeals the judgment in this health care liability claim in which the jury
awarded $362,000 in damages to appellee/cross-appellant, Madison “Matt” Ray
Harlien.[1] 
By two issues, Spohn contends that:  (1) the judgment was not supported by
legally and factually sufficient evidence; and (2) although Mathew T.
Alexander, M.D. settled with the Harliens before trial, the trial court
nevertheless erred by not submitting the question of his negligence to the jury. 
By one cross-issue, Harlien contends that the evidence was not legally
sufficient to support the jury’s finding that Brent Hagemeister, M.D.’s
negligence, as opposed to that of Spohn and its agents, was a proximate cause
of sixty percent of Harlien’s injuries.  We affirm.

I.  Background

            Harlien, a former professional football player,
underwent a ten-and-a-half hour spinal surgery at Spohn’s Hospital in Corpus
Christi, Texas.  During the surgery, Harlien sustained injuries due to pressure
created by the contact of his body with the surgical table and padding.  Dr.
Alexander, a neurosurgeon, performed the operation assisted by
anesthesiologists Dr. Hagemeister and Eugene Theriot, M.D.—each of whom was
present for only part of the surgery—as well as several nurses employed by
Spohn, including Nanette Zamora, R.N., Becky Scoggin, R.N., and Becky
Kowalczyk, R.N.  In preparation for the surgery, Harlien was placed face-down
on a “Jackson” table.  According to the testimony adduced at trial, all types
of surgical tables create pressure on the patient at the points where the table
comes in contact with the body.  A “Jackson” table, in particular, creates
these pressure points at the chest and hips of the patient.  Witnesses for
Harlien indicated that both the length of the procedure and the physical
characteristics of the patient can increase the risk of pressure-related
injuries, and that Harlien was particularly susceptible to such injuries due to
his weight of 400 pounds, his muscular build, and the fact that the procedure
lasted over ten hours.  The evidence showed that a patient must be repositioned
throughout such a procedure between every two to six hours to prevent pressure
sores and to allow circulation.  

Harlien was not repositioned once
during the surgery.  As a result, Harlien suffered pressure sores on his chest
and a type of nerve damage known as brachial plexus atrophy palsy affecting his
extremities.  The jury heard testimony that the nerve damage caused Harlien’s
arms to atrophy and that Harlien has become permanently disabled with little or
no use of some of his fingers.

Harlien filed suit against Spohn
for the negligence of its employee nurses; he also filed suit against Dr.
Alexander, the neurosurgeon, and the anesthesiologists, Drs. Hagemeister and
Theriot.  Before the trial began, Dr. Alexander settled with Harlien, and Dr.
Theriot was non-suited.  Dr. Hagemeister settled before opening arguments to
the jury began.

Harlien introduced two expert
witnesses in his case-in-chief, John Sterling Meyer, M.D.[2]
and John Garino, M.D.[3] 
The witnesses were accepted by the court as experts in neurology and
anesthesiology, respectively.  Dr. Meyer was specifically instructed by the
court not to testify as to the standard of care relevant to nurses.  Dr. Garino,
however, was not so instructed and did in fact testify as to the applicable
standard of care of nurses during such a procedure.  The following exchange
occurred on direct examination:

Q:
      [Counsel for Harlien]  [B]ased on your participation in between 500 and a
thousand spinal surgeries, are you familiar with the standard of care as it
applies specifically to nurses and their responsibility to plan to prevent the
formation of pressure points—pressure ulcers, nerve damage, and all other
pressure related injuries in this type of procedure?

 

A: 
    [Dr. Garino]  Yes, I am.

 

Q:
      Are you familiar, again, based on all of the previously listed experience
with the standard of care as it applies to the Spohn nurses in the setting up
of the padding for this type of procedure?

 

A: 
    Yes, I am.

 

Q: 
    Are you familiar with the standard of care as it applied to the nurses for
the monitoring of pressure points and pressure-related injuries in a procedure
such as this one?

 

A:
      Yes, I am.

 

Q: 
    And finally, are you familiar with the standard of care as it applies to
the Spohn nurses[’] obligation to [reposition] patients during the course of
spinal surgery such as this one and thereby prevent pressure related injuries?

 

A: 
    Yes, sir.

 

Q: 
    And all of those opinions are based not only on your education and training
but on your substantial experience in these types of procedures?

 

A: 
    Yes, that’s true.

 

Dr. Garino then opined that the standard of care required
Spohn’s nurses to monitor pressure points, move the patient, and relieve
pressure that built up during the procedure.  He additionally testified that he
believed that Harlien’s injuries were caused by the negligence of Spohn’s
nurses in failing to satisfy that standard of care. 

Additionally, Spohn called several
witnesses, including Dr. Hagemeister and Nurses Scoggin, Zamora, Kwalzik, and
an expert on nursing, Marla Loring, R.N.  Each of these witnesses addressed the
standard of care applicable to the nurses employed by Spohn, with the general
consensus being that the anesthesiologist and nurses are responsible for
repositioning a patient during a surgery like the one undergone by Harlien.  In
one such exchange, Nurse Scoggin testified as follows:

Q:
      [Counsel for Harlien] And what the nursing staff is charged with is doing
what the standards of care charges you and all of your nurses to do is to think
in advance of the problems, because it doesn’t do you any good to recognize it
once it’s there.  Then all you can do is clean the wounds and hope that they
heal.  That’s not what you want to do, is it?

 

A: 
    [Nurse Scoggin] No, sir.

 

Q:
      What you want to do and what the standard of care requires that you do is
recognize he’s a big man.  It’s a long surgery, and it’s gone a lot longer than
anticipated and reposition Mr. Harlien?

 

A: 
    Yes, sir.

 

Additionally, Nurse Loring’s testimony indicated that the
standard of care recognized by the Association of Operating Room Nurses (“AORN”)
required nurses to recognize that prolonged pressure could cause injury to
patients and that repositioning should occur every two to four hours.

After hearing the evidence, the
jury returned a verdict in which it found damages in the amount of $905,000. 
The jury found Dr. Hagemeister to be liable for sixty percent of the damages
and found Spohn to be liable for forty percent of the damages.  Spohn was
ordered to pay its share of the damages in the amount of $362,000.  Each party
moved for a judgment notwithstanding the verdict (“JNOV”).  Spohn argued that
no evidence supported a finding of its liability and asked that the trial court
enter a JNOV by which Harlien would take nothing.  Harlien argued that no
evidence supported the jury’s finding that Dr. Hagemeister was liable for sixty
percent of the damages and asked that the trial court enter a JNOV requiring
Spohn to pay the entire amount of damages assessed by the jury.  The trial
court denied both motions for JNOV, and this appeal followed.  

 

II.  Sufficiency of the Evidence

            By its first issue, Spohn contends that
the evidence was legally and factually insufficient to support the jury’s
verdict because Harlien did not present any competent evidence demonstrating
the standard of care relating to Spohn’s nurse employees.  Specifically, Spohn
contends that the testimony offered by Harlien’s experts to establish a
standard of care for its nurses was not competent evidence because Harlien’s
witnesses were not “nursing experts,” and therefore, their testimony concerning
the nursing standard of care amounted to no evidence.  

A.  Standard of Review

            When reviewing the jury’s verdict for legal
sufficiency of the evidence, we view all of the evidence in the light most
favorable to the jury’s findings, giving full credit to all favorable evidence
if any reasonable juror could, and disregarding contrary evidence unless
reasonable jurors could not.  City of Keller v. Wilson, 168 S.W.3d 802,
807 (Tex. 2005).  We will only reverse a jury’s verdict based on a legal
sufficiency challenge if:  (1) there is a complete absence of evidence of a
vital fact; (2) all the evidence offered to prove a vital fact amounts to only
a mere scintilla and no more; (3) the rules of evidence forbid consideration of
the only evidence offered to prove a vital fact; or (4) the evidence which the
jury was compelled to consider and believe conclusively establishes the
opposite of the vital fact.  Id. at 810 & n.15-16.

            In reviewing the factual sufficiency of the
evidence, we consider and weigh all of the evidence, and we will only set aside
the judgment if it is so contrary to the overwhelming weight of the evidence as
to be clearly wrong and manifestly unjust.  Pool v. Ford Motor Co., 715
S.W.2d 629, 635 (Tex. 1986).  Under this standard, it is the jury’s role, not
this Court’s, to judge “the credibility of the evidence, to assign the weight
to be given to testimony, and to resolve inconsistencies within or conflicts
among the witnesses’ testimony.”  Walker v. Ricks, 101 S.W.3d 740, 749
(Tex. App.–Corpus Christi 2003, no pet.).  We will not substitute our judgment
for that of the jury.  Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 407
(Tex. 1998).  

B.  Applicable Law

            In a medical negligence claim, a plaintiff must
establish legally sufficient evidence regarding the duty—or standard of care—that
the health care provider owed to the patient.  Hamilton v. Wilson, 249
S.W.3d 425, 426 (Tex. 2008).  Incompetent evidence is “insufficient to support
a judgment, even if admitted without objection . . . [and]
evidence showing it to be incompetent evidence cannot be disregarded, even if
the result is contrary to the verdict.”  City of Keller, 168 S.W.3d at
812; see also W. Wendell Hall, et al., Hall’s Standards of Review in
Texas, 42 St. Mary’s L.J. 3,
38-60 (2010) (discussing, at length, the Texas Supreme Court’s requirements for
sufficiency review of jury verdicts and specifically discussing the competency
requirements for expert witnesses).  “[W]hen expert testimony is required, lay
evidence supporting liability is legally insufficient.”  City of Keller,
168 S.W.3d at 812.  In order to determine the competency of an expert’s
testimony, we cannot view his opinion in isolation, but must consider other
evidence that would tend to show the testimony is incompetent.  See id.
at 813 (recognizing that evidence may seem to be competent when viewed alone
but not when viewed in light of other evidence).  However, this competing
evidence must show that the trial court abused its discretion in determining
that a witness was qualified as an expert.  Broders v. Heise, 924 S.W.2d
148, 151 (Tex. 1996).  Therefore, we will not disturb the trial court’s
determination unless it acted without reference to any guiding rules or
principles.  Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238,
241-42 (Tex. 1985).

            In a medical negligence claim, a professional
need not be employed in the particular field about which he is testifying so
long as he can demonstrate that he has knowledge, skill, experience, training,
or education regarding the specific issue before the court that would qualify
him to give an opinion on that subject.  Broders, 924 S.W.2d at 153-54.  “[W]hen
a party can show that a subject is substantially developed in more than one
field, testimony can come from a qualified expert in any of those fields.”  Id.
at 154.

C.  Discussion

            Spohn argues that Dr. Garino’s testimony was
incompetent—and, therefore, amounted to no evidence—because he was not a
nursing expert.  Spohn asks this Court to hold that the trial court abused its
discretion in allowing Dr. Garino to testify as an expert on the standard of
care applicable to nurses in this case, and additionally, asks us to hold his
testimony incompetent as a matter of law.  We cannot so hold.

            Dr. Garino testified that he had been involved
in “between 500 and a thousand spinal surgeries” as a board-certified
anesthesiologist, and that it was both the anesthesiologists’ and the nurses’
joint responsibility to ensure that a patient was repositioned during a lengthy
procedure.  He also testified that he was familiar with the standard of care
applicable to nurses based on his education, training, and his extensive
experience with the type of procedure performed in this case, and that he
supervised nurses in his own practice.  See Tex. R. Evid. 702 (allowing experts to testify based on
their “knowledge, skill, experience, training, or education”); Tex. Civ. Prac. & Rem. Code Ann. § 74.402 (West 2010) (listing
requirements for an expert to be qualified in a suit against a health care
provider); Broders, 924 S.W.2d at 153-54.  

Spohn urges this Court to find an
abuse of discretion based on Dr. Garino’s testimony on cross-examination
wherein he agreed with Spohn’s counsel that he was not holding himself out to
be a “nurse expert”; that he was “not going to be offering opinions in this
case regarding nursing and Texas law regarding nursing”; that he had “never
been in charge of actually supervising circulating nurses”; and that he had
never directed nurses on how to pad the specific “Jackson” type of table used
during Harlien’s procedure.  However, this testimony is only indicative of the
fact that Dr. Garino is not an expert on nursing generally, not that he was unqualified
to testify about the very specific nursing standard of care relating to
repositioning a patient during a lengthy procedure.  Dr. Garino testified that
although he did not have experience with the “Jackson” table, all surgical
tables create pressure points in specific areas and require repositioning of
the patient.  

Spohn also argues that Dr. Garino’s
testimony as to the nurses’ standard of care based on the fact that he has worked
in the same room as them is analogous to “the surgical technician, charged with
handing the surgeon the requested instruments, saying he is familiar with the
standard of care for a circulating nurse because he has watched so many
surgeries.”  We disagree.  As we previously noted, Dr. Garino testified that
the anesthesiologist and the nurses share the same standard of care with
respect to repositioning the patient—unlike the spectating technician in
Spohn’s hypothetical.  This view was also shared by several of Spohn’s
witnesses, including Dr. Hagemeister who testified that the nurse and
anesthesiologist had “overlapping duties.”

Based on the foregoing, it was
within the discretion of the trial court to find that Dr. Garino was qualified
to testify as to the appropriate standard of care for the nurses in this case. 
See Broders, 924 S.W.2d at 151.  And, for these same reasons, the
testimony advanced by Spohn in this case does not support the contention that
Dr. Garino’s testimony was incompetent as a matter of law.  In so holding, we
consider all of the evidence and find none that necessarily prevents Dr. Garino
from being qualified as an expert on the nurses’ standard of care in this case
or from giving a competent opinion under Rule of Evidence 702 and section
74.402 of the Texas Civil Practice and Remedies Code.  See Tex. R. Evid. 702; Tex. Civ. Prac. & Rem. Code Ann. §
74.402; City of Keller, 168 S.W.3d at 812.  Therefore, we conclude that the
testimony was competent and legally sufficient to support the judgment.  

Moreover, because Spohn’s own
witnesses agreed with Dr. Garino about the nurses’ standard of care—for
example, when Nurse Scoggin testified that the standard of care required that
she recognize that Harlien was “a big man”; that it was “a long surgery, and it
[had] gone a lot longer than anticipated”; and that she “reposition Mr.
Harlien”—and Spohn points to no additional evidence in the record that would
discredit this testimony, we cannot say that the evidence in the record indicating
a breach of the nurses’ standard of care was so contrary to the overwhelming
weight of the evidence as to be clearly wrong and manifestly unjust.  See
Pool, 715 S.W.2d at 635.  Accordingly, we overrule Spohn’s first
issue.

III.  Submission of Third-Party Liability

            By Spohn’s second issue and Harlien’s single
cross-issue, each party contends that the trial court erred in submitting or
failing to submit the question of the liability of third parties to the jury. 
Specifically, Spohn contends that the trial court erred by not submitting the
question of settling codefendant Dr. Alexander’s liability; and on the other
hand, Harlien contends that the trial court erred in submitting the question of
settling codefendant Dr. Hagemeister’s liability because it was not supported
by legally sufficient evidence.

A.  Standard of Review

            If the admissible evidence at trial would
support, by legally sufficient evidence, a finding that a settling codefendant
was partially responsible for the harm alleged in the cause of action, the
trial court must submit the question of the percentage of responsibility of
each such party to the jury.  Tex. Civ.
Prac. & Rem. Code Ann. § 33.003 (West 2010); Elbaor v. Smith,
845 S.W.2d 240, 243 (Tex. 1992).  This Court will find such legally sufficient
evidence only where “the evidence furnishes some reasonable basis for differing
conclusions by reasonable minds about a vital fact’s existence.”  Rocor
Int’l, Inc. v. Nat’l Union Fire Ins. Co., 77 S.W.3d 253, 262 (Tex. 2002).

B.  Dr. Alexander

            Spohn contends that Dr. Alexander’s liability
should have been presented to the jury because there was legally sufficient
evidence to show that he:  (1) was ultimately responsible for the padding and
positioning of Harlien on the surgical table; (2) breached the standard of care
with respect to the padding and positioning on the table; and (3) this breach
was a proximate cause of Harlien’s injuries.  We disagree because there is no
evidence to support the element of causation.  Despite the fact that the
evidence established that Dr. Alexander was responsible for choosing the
particular table to be used and that he was responsible for the initial padding
and positioning of Harlien on that table before the procedure, no evidence was
presented to show that these functions caused of any of Harlien’s injuries.  

Harlien’s theory at trial was that
it was the failure to reposition him that was the cause of his injuries,
not that the table or padding was chosen or initially positioned improperly. 
Spohn cites no relevant evidence in the record, and we find none, that supports
the proposition that either the padding itself was the cause of Harlien’s
injuries, or that Dr. Alexander had a duty to monitor the pressure points on
Harlien’s body during the surgery.  See Hamilton, 249 S.W.3d at 426
(outlining the necessary elements that must be shown to establish liability in
a medical negligence claim).  

Therefore, because legally
sufficient evidence of Dr. Alexander’s liability was not presented to the jury,
it was not error for the trial court to refuse to instruct the jury on the
question of Dr. Alexander’s proportional liability.  See Tex. Civ. Prac. & Rem. Code Ann. §
33.003; Elbaor, 845 S.W.2d at 243.  Accordingly, Spohn’s second issue is
overruled.

C.  Dr. Hagemeister

            In stark contrast to the evidence supporting Dr.
Alexander’s liability, the evidence supporting Dr. Hagemeister’s liability
abounds in the record.  As we noted above, several witnesses testified that it
was the joint responsibility of the anesthesiologist and the nurses to
reposition Harlien on the surgical table.  In one such exchange, Dr. Garino,
Harlien’s anesthesiology expert, testified as follows:

Q:
      [Counsel for Harlien] Do you have an opinion as to whether or not it is
reasonable and prudent for a nurse and/or an anesthesiologist to regularly
relive pressure across the chest as you have suggested?

 

A: 
    [Dr. Garino] Yes.

 

Q: 
    What is that opinion?

 

A:
      That it is reasonable and prudent to be vigilant and monitor the pressure
points to try to relieve that pressure in regular intervals, to document that
process during the procedure.

 

Q:        Do
you have an opinion as to whether or not it is foreseeable if you fail to
relieve the pressure across the chest, as you have suggested, that the risk of
pressure-related injuries is extremely high in Mr. Harlien’s particular case?

 

A:        Yes,
I do.

 

Q:        And
what is that opinion?

 

A:        Yes. 
It is very high.  I think in any long procedure it’s foreseeable [that] not
relieving pressure points is going to cause a problem even in people not his
size.  It’s going to be an issue in a case more so in a large person.  

 

Additionally, Dr. Hagemeister himself testified that he was
responsible for moving the head, neck, shoulders, and possibly the arms of the
patient and for monitoring pressure points.  This was clearly more than a
scintilla of evidence to support the question of Dr. Hagemeister’s liability as
the primary anesthesiologist during the time in which Harlien’s injuries
occurred.  As such, the evidence furnished at least some reasonable basis for
differing conclusions as to Dr. Hagemeister’s proportional liability, and the
question was properly submitted to the jury.  See Tex. Civ. Prac. & Rem. Code Ann. §
33.003; Elbaor, 845 S.W.2d at 243; Rocor Int’l, Inc., 77
S.W.3d at 262.  Accordingly, Harlien’s cross-issue is overruled.  

IV.  Conclusion

            Having
overruled all of the parties’ issues on appeal, we affirm the trial court’s
judgment.  

 

________________________

GINA
M. BENAVIDES,

Justice

 

 

Delivered and filed the

9th day of June, 2011. 









[1] Harlien’s wife, Tauny Harlien, was
also a party to this suit.  However, the jury awarded her no separate damages,
and she does not appeal the judgment on her separate claims.





[2] The record indicated that Dr. Meyer is a board-certified neurologist, a professor of neurology at Baylor College
of Medicine, and the Chief of Neurology at both Methodist Hospital and Ben Taub
General Hospital in Houston.  He testified that he was “very” familiar with the
“Jackson”-type table used
during Harlien’s surgery.  Spohn agreed at trial that he was “wonderfully
qualified” to testify as to neurological questions as well as causation and
damages but objected to him being qualified as an expert on the question of the
nursing standard of care.  The Harliens’ counsel agreed to limit the scope of
Dr. Meyer’s testimony, and accordingly, Spohn’s objection was overruled.

 





[3] The record indicated that Dr. Garino is a board certified
anesthesiologist with over twenty years’ experience.  He testified that, over
the course of his career, he has participated in between twelve and sixteen
thousand procedures with between five hundred and one thousand of those being
spinal surgeries.  On cross-examination, he additionally testified that, though
he does not have control of circulating nurses employed by other entities, he
works collaboratively with them and supervises the nurse anesthetists in his
own practice “almost on a daily basis.”